# No. 15-1672

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

UNITED STATES OF AMERICA, *et al.*,
*Plaintiffs-Appellees*,

v.

AMERICAN EXPRESS CO., *et al.*,
*Defendants-Appellants*,

_____

ON APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
(HONORABLE NICHOLAS G. GARAUFIS)
_____

MEMORANDUM OF *AMICUS CURIAE* SOUTHWEST AIRLINES CO.
IN OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION
TO STAY INJUNCTION PENDING APPEAL

Alden L. Atkins
Vincent van Panhuys
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037-1701
Telephone: 202.639.6613
Facsimile: 202.639.6604
*Counsel for Southwest Airlines Co.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Southwest Airlines Co. states that it is a publicly-traded corporation, has no parent corporation, and no publicly-traded corporation owns more than ten percent of its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..........................................i

TABLE OF CONTENTS.......................................................... ii

TABLE OF AUTHORITIES ..................................................... iii

TABLE OF ABBREVIATIONS ...................................................v

Interest of *Amicus Curiae* Southwest Airlines Co. ....................................1

Introduction .....................................................................2

Background .....................................................................3

Argument........................................................................6

    I.    AMEX IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL...........................................................7

    II.    AMEX WILL NOT BE IRREPARABLY HARMED ABSENT A STAY..................................................................8

    III.    A STAY WOULD SUBSTANTIALLY INJURE MERCHANTS AND CONSUMERS, AND HARM THE PUBLIC INTEREST........................................................9

Conclusion .....................................................................10

ii

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## Cases

*Anderson v. City of Bessemer*,
   470 U.S. 564 (1985) ..................................................................... 8

*FTC v. Indep. Fed'n of Dentists*,
   476 U.S. 447 (1986) ..................................................................... 8

*In re Realcomp II Ltd.*,
   No. 9320, 2007 WL 6936319 (F.T.C. Oct. 30, 2009),
   *stay denied*, 2010 WL 5576189 (F.T.C. Jan. 7, 2010),
   *pet. for review denied*, 635 F.3d 815 (6th Cir.),
   *cert. denied*, 132 S. Ct. 400 (2011) ........................................... 7

*In re Realcomp II, Ltd.*,
   No. 9320, 2010 WL 5576189 (F.T.C. Jan. 7, 2010),
   *pet. for review denied*, 635 F.3d 815 (6th Cir.),
   *cert. denied*, 132 S. Ct. 400 (2011) ........................................... 6

*New York v. Actavis PLC*,
   No. 14-4624 (2d Cir. Jan. 6, 2014)............................................... 6

*SEC v. Citigroup Global Markets Inc.*,
   673 F.3d 158 (2d Cir. 2012) (per curiam) .................................... 6

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998) .......................................................... 8

*United States v. Apple Inc.*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013)........................................... 7

*United States v. Apple Inc.*,
   No. 13-3741, 2014 U.S. App. LEXIS 8108 (2d Cir. Feb. 10, 2014) .......... 6

*United States v. Visa U.S.A., Inc.*,
   No. 98 CIV 7076, 2002 WL 638537 (S.D.N.Y. Feb. 7, 2002),
   *aff'd*, 344 F.3d 229 (2d Cir. 2003) ........................................... 10

*United States v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003) .......................................... 7, 8, 10

iii

**Rules**

Fed. R. App. P. 26.1 ................................................................................i

Fed. R. App. P. 29(a) .............................................................................1

Local Rule 29.1 ......................................................................................1

**Other Authorities**

Dan Schulman, *PayPal Agrees to Acquire Paydiant*, PayPal Forward Blog
(Mar. 2, 2015) .................................................................................5

## **TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ACH | Automated Clearing House |
| Amex | American Express Company and American Express Travel Related Service Company |
| Amex Mot. | American Express Company's Emergency Motion to Stay Pending Appeal, *United States, et al. v. American Express Co., et al.*, No. 15-1672 (2d Cir. filed on May 26, 2015) |
| Amex E.D.N.Y. Mem. | American Express Company's Memorandum of Law in Support of Its Motion to Stay Pending Appeal, *United States of America, et al. v. American Express Company, et al.*, No. 10-cv-4496 (NGG) (RER) (E.D.N.Y.  filed on May 1, 2015) |
| Decision | Decision, *United States of America, et al. v. American Express Company, et al.*, No. 10-cv-4496 (NGG) (RER) (E.D.N.Y. Feb. 19, 2015) |
| GPCC | General Purpose Credit Card |
| MCX | Merchant Consumer Exchange |
| NDPs | American Express's Non-Discrimination Provisions  (also referred to as "anti-steering provisions") |
| Southwest | Southwest Airlines Co. |

## Interest of *Amicus Curiae* Southwest Airlines Co. [1]

As a low cost air carrier, Southwest's ability to reduce its costs, like credit card costs, is at the core of its business model. Southwest has succeeded in the marketplace by reducing its costs in all aspects of its business, enabling it to provide high quality service at lower prices than its competitors. Southwest is particularly well situated to implement the procompetitive benefits of the injunction. Southwest anticipates it would be able to achieve major cost savings and create greater value for its customers if it could steer customers to lower cost forms of payment. As it has done with its co-branded card, Southwest can, for example, offer Rapid Rewards frequent flier points to encourage customers to use lower cost forms of payment. The stay requested by Amex would prevent Southwest and other merchants from steering customers to lower forms of payment and limit their ability to negotiate lower rates with Amex. This would result in hundreds of millions (if not billions) of dollars in excess costs incurred by Southwest, other merchants, and their customers.

---

[1] All parties have consented to the filing of this amicus brief. Accordingly, this brief may be filed without leave of court, pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. Also, pursuant to Rule 29.1 of this Court's Local Rules, (1) Southwest certifies that this brief was authored entirely by counsel for Southwest and not by counsel for any party, in whole or in part; (2) no party and no counsel for any party contributed money intended to fund preparing or submitting this brief; and (3) apart from Southwest, no other person contributed money intended to fund preparing or submitting this brief.

In addition, Southwest is part of a group of forty major merchants (called "MCX") that has developed CurrentC, a mobile, low cost payment system that facilitates merchants' ability to steer to a preferred payment method. CurrentC competes with other mobile payment systems like Apple Pay that are supported by Amex and the other major credit card networks (and that have not committed to lowering costs or allowing merchant steering.) Without the injunction, Southwest and other merchants are restricted from steering customers towards CurrentC and other low cost payment solutions like PayPal. Granting the stay, therefore, may stifle the development of low cost payment solutions and entrench mobile payment systems favoring Amex and other major credit card networks.

For these reasons, *amicus curiae* Southwest has a strong interest in the outcome of this motion by American Express.

## **Introduction**

Southwest urges the Court to deny the request for a stay pending appeal by Amex. Amex is unlikely to convince the Court to overturn the well-reasoned analysis of the district court that is based on an extensive factual record. In addition, the stay would allow Amex to continue charging supra-competitive prices and would also suppress innovation of alternative payment solutions that would compete with Amex and the other major networks. The cost of denying

2

competition to the entire market place during Amex's appeal far outweighs any potential costs to Amex of having to face that competition.

## **Background**

After a seven week trial resulting in nearly 7,000 transcript pages and over 1,000 exhibits, the district court determined that the Amex NDPs unlawfully restrain trade because they insulate Amex (and its competitors) from inter-brand competition in the network services market. (Decision at 7, 133) In a normal competitive market place "[m]erchants routinely attempt to influence customers' purchasing decisions, whether by placing a particular brand of cereal at eye level rather than on a bottom shelf, discounting last year's fashion inventory, or offering promotions such as 'buy one, get one free'" but the court noted that this competitive dynamic "is absent in the credit card industry" as a result of the NDPs. (*Id.* at 3) The "'market is broken'" concluded the court, "because the GPCC networks do not compete on the basis of merchant pricing." (*Id.* at 103 (quoting Chris Priebe, Southwest Director of Payment Strategies, Tr. 2440:4-15)) Simply stated, the person who decides what product to use—the consumer—is not the person who pays the costs of that decision—the merchant. Amex competes not by offering more favorable prices or terms to merchants, but instead by offering inducements (paid for by the merchants) to consumers to use its higher priced card. Amex's anti-steering rules are designed to maintain that separation, thus insulating

3

Amex from competing to make its card more attractive to merchants, such as with lower discount fees.  (Decision at 101)

Bolstered by the unlawful NDPs, between 2005 and 2010 Amex imposed "dramatic increase[s]" of its discount fees on Southwest and other merchants.[2]  The district court determined that the Amex NDPs "vitiat[e] an important source of downward pressure on Defendants' merchant pricing, and result[] in higher . . . prices across the network services market." (Decision at 102)  The court also determined that "[m]erchants facing increased credit card acceptance costs will pass most, if not all, of their additional costs along to their customers in the form of higher retail prices."  (Decision at 113)

The injunctive relief ordered by the district court "is designed to eliminate the consequences of Defendants' past [Sherman Act violation] *and to encourage a functional and fair market in the future*."[3]  The injunction has immediate procompetitive effects on merchants and consumers by enabling merchants to steer consumers to lower cost forms of payment and to negotiate lower rates with Amex.

The district court also determined that the Amex NPDs cause a "stunting [of] innovation" in the market for payment networks: "anti-steering rules . . . are

---

[2]Tr. 2398:9-20 (Priebe/Southwest); *see also* Decision at 67 (Amex imposed "significant price increases . . . between 2005 and 2010 without any meaningful merchant attrition").

[3] Mem. at 3 (Apr. 30, 2015) [Dkt. 639] (re permanent injunction) (emphasis added).

responsible for inhibiting the development of several proposed merchant-owned payment solutions" including MCX and its CurrentC system. (Decision at 98, 115-16)  Amex, merchants and a multitude of other players are engaged in intense competition for the development of mobile payment technology platforms.  The major credit card networks – Amex, Visa and MasterCard – are investing billions of dollars in mobile platform technology but, unsurprisingly, not in platforms that are low cost or emphasize merchant steering.  If Amex and the other major networks win the battle of competing technologies, they can establish and entrench a payment system that will maximize their fee revenues at the expense of merchants and consumers.

In contrast, forty major merchants, including Southwest, Wal-Mart, CVS, Lowe's, 7-11, and ExxonMobil, have developed CurrentC, a mobile payment platform that is low cost and facilitates merchants' ability to steer to a preferred payment method. (*Id.* at 116)  Similarly, PayPal has a proven track record of steering customers to low cost payment methods,[4] and it has been taking important steps to develop a low cost, merchant-friendly mobile payment platform.[5]  The development of such low cost mobile payment solutions, however, is restrained by

---

[4] "PayPal . . . [is] effective at steering customers to debit and ACH."  (Decision at 70)

[5] For example, PayPal recently purchased Paydiant, which supplies the technology behind CurrentC.  *See* Dan Schulman, *PayPal Agrees to Acquire Paydiant*, PayPal Forward Blog (Mar. 2, 2015), https://www.paypal-community.com/t5/PayPal-Forward/PayPal-Agrees-to-Acquire-Paydiant/ba-p/954238.

5

the Amex NDPs because they restrict merchants from steering towards CurrentC and PayPal.[6]  Such unbalanced restrictions will continue to favor Amex and limit consumer use and acceptance of these low cost platforms and thereby also restrain the incentives of market participants to invest in these solutions.

### Argument

This Court considers four factors on a motion for a stay pending appeal, all of which weigh against a stay here: (1) Amex is unlikely to succeed on the merits of its appeal; (2) Amex will not be irreparably injured absent a stay; (3) a stay would substantially injure merchants and consumers as a result of higher discount fees and reduced innovation; and (4) a stay would harm the public interest by stifling competition and the development of low cost payment systems.[7]  Recent decisions have denied stays of injunctions, like this one, that require the defendant to change its business to correct competitive harm to the market.[8]

---

[6] *See* Tr. 2427:19-23, 2428:16-24, 2436:1-20, and 2505:8-19 (Priebe/Southwest).

[7] *See, e.g.*, *SEC v. Citigroup Global Markets Inc.*, 673 F.3d 158, 162 (2d Cir. 2012) (per curiam) (setting out the factors).

[8] *See, e.g.*, *United States v. Apple Inc.*, No. 13-3741, 2014 U.S. App. LEXIS 8108, at *21 (2d Cir. Feb. 10, 2014) (denying motion to stay appointment of an antitrust compliance monitor); *New York v. Actavis PLC*, No. 14-4624 (2d Cir. Jan. 6, 2014) (denying motion to stay injunction barring drug maker from halting sales of its drug); *In re Realcomp II, Ltd.*, No. 9320, 2010 WL 5576189, at *1, *5 (F.T.C. Jan. 7, 2010) (denying stay of injunction that invalidated rules interfering with the ability of defendant's broker members to engage in certain discounting practices).

## I.  AMEX IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL.

The antitrust issues in this case are straightforward.  The person that makes the decision about which form of payment to use (the customer) does not pay the costs resulting from that choice.  (*See* Decision at 101)  Amex's NDPs are designed to maintain that separation, thus restraining competition by protecting Amex from competitive pressure to reduce its rates to merchants.  (*Id.*)  Courts and antitrust agencies routinely find antitrust liability in cases that restrain competition in complex industries or two-sided markets.[9]  Notably, in *United States v. Visa U.S.A., Inc.*, this Court invalidated anticompetitive contract provisions of credit card companies and determined that MasterCard had market power with a 26% share of the market (the identical share Amex has here) in the same market for network services at issue in this case.[10]  Although Amex argues that it lacks sufficient market share to restrain competition, the decision sets forth extensive evidence that the NDPs have caused "'actual, sustained adverse effects on competition,'" and those direct anticompetitive effects obviate the need for a

---

[9] *See, e.g.*, *United States v. Apple Inc.*, 952 F. Supp. 2d 638 (S.D.N.Y. 2013) (e-book distributor liable for antitrust conspiracy with e-book publishers) (appeal filed Second Circuit); *In re Realcomp II Ltd.*, No. 9320, 2007 WL 6936319, at *10, *17 (F.T.C. Oct. 30, 2009) (defendant contract provisions and business practices in the real estate multiple listing service, a "two-sided market," violated antitrust laws), *stay denied*, 2010 WL 5576189 (F.T.C. Jan. 7, 2010), *pet. for review denied*, 635 F.3d 815 (6th Cir.), *cert. denied*, 132 S. Ct. 400 (2011).

[10] 344 F.3d 229, 240 (2d Cir. 2003); Decision at 67.

7

detailed market power analysis.[11]  (*See* Decision at 98-127 (detailing how the NDPs "Impede Horizontal Interbrand Competition," "Block Low-Cost Business Models," "Stifle Innovation," and how their removal "Would Benefit Merchants and Consumers"))   In addition, the district court's factual findings, which are based on an extensive factual record, can be reversed only if clearly erroneous.[12]

## II.   AMEX WILL NOT BE IRREPARABLY HARMED ABSENT A STAY.

Amex's claims of "irreparable harm" as a result of "loss of business" are not plausible.  (Amex Mot. at 17)  Amex has experience conducting its business with merchant steering.  It did so before it fortified its NDPs in the 1990s, and, in more recent years, Amex has faced steering by Southwest and other merchants to co-branded cards, debit cards, and in short term promotions.[13]  In addition, Amex "has identified a range of potential permissible steps that the company could take in order to protect its ability to deliver a differentiated product if steering is permitted."  (Decision at 139)  Amex has had years during this litigation to prepare

---

[11] *See* Decision at 99 (quoting *FTC v. Indep. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("actual, sustained adverse effects on competition [are] . . . legally sufficient to support a finding that the challenged restraint [is] unreasonable")); *see also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("actual adverse effect on competition" enough for finding harm (emphasis, internal quotation marks omitted)).

[12] *Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985); *Visa U.S.A., Inc.*, 344 F.3d at 238.

[13] *See* Decision at 23-24, 28-30, 104-05.

for this result. Amex cannot legitimately claim that it is incapable of viably conducting its business without NDPs.

Moreover, Amex's claimed "disruption of the structure of the business relationship between American Express and its merchant customers" (Amex E.D.N.Y. Mem. at 9) can be managed by Amex and the merchants without court intervention. Amex and merchants can build into their contract negotiations the risk of reversal on appeal. Merchants can assess for themselves the cost / benefit analysis of switching to steering when there is a possibility they may have to switch back.

## III.    A STAY WOULD SUBSTANTIALLY INJURE MERCHANTS AND CONSUMERS, AND HARM THE PUBLIC INTEREST.

A stay would enable Amex to continue to charge excessive fees for the duration of the appeals period, protected from the competitive pressure that merchants might otherwise steer customers to lower cost forms of payment. Without NDPs, Southwest and other merchants would immediately have a stronger ability to negotiate lower rates with Amex which would, in turn, result in lower retail prices for consumers. (Decision at 113) Merchants would save hundreds of millions (if not billions) of dollars of fees that would otherwise be passed on to consumers.[14] Amex says that those overcharges could be compensated by money

---

[14] Anticompetitive effect of NDPs accounted for 65% of Amex annual U.S. charge volume in the late 2000s. (Decision at 111) Amex 2014 U.S. revenue from

9

damages (Amex Mot. at 19), but it has entered into a proposed settlement with a putative merchant class that if approved would significantly limit the ability of merchants, like Southwest, to recover damages.[15]

Merchants and consumers would also incur the costs of reduced innovation resulting from Amex's anticompetitive contract provisions. Amex and many others are in the midst of intense competition for the development of mobile payment technology platforms, and the winner will enjoy wide market acceptance. A stay will likely inhibit the ability of Southwest and others to implement an open, low-cost mobile platform and would favor companies like Amex who stand to benefit from a more discriminatory, high cost platform.

Amex's appeal is likely to take years, even with an expedited briefing schedule.[16] The cost of higher fees and reduced innovation incurred by merchants and consumers during that time constitute unambiguous harm to the public interest.

## Conclusion

For the foregoing reasons, Southwest respectfully requests that the Court deny Amex's motion to stay the injunction pending its appeal.

---

discount fees, card fees and related payments was $12.73 billion. (Amex 2014 Annual Report at 30)

[15] *See In re American Express Anti-Steering Rules Antitrust Litigation (II)*, No. 11-MD-02221, Settlement Agreement, at ¶¶ 26, 27, 29 [Dkt. 306-2].

[16] *See United States v. Visa U.S.A., Inc*., No. 98 CIV 7076, 2002 WL 638537, at *1 (S.D.N.Y. Feb. 7, 2002) (appeal took two years, even though the parties agreed to seek expedited consideration), *aff'd*, 344 F.3d 229.

June 5, 2015                                   Respectfully submitted,


                                               VINSON & ELKINS L.L.P.


                                               /s/ Alden L. Atkins
                                               Alden L. Atkins
                                               Vincent van Panhuys
                                               2200 Pennsylvania Avenue, N.W.
                                               Suite 500 West
                                               Washington, D.C.  20037-1701
                                               Telephone:  202.639.6613
                                               Facsimile:  202.639.6604
                                               aatkins@velaw.com
                                               vvanpanhuys@velaw.com

                                               *Counsel for Southwest Airlines Co.*

11

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies the typeface requirements of Rule 32(a)(5) of the

Federal Rules of Appellate Procedure and the type style requirements of Rule

32(a)(6) because this memorandum has been prepared in a proportionally spaced

typeface using Microsoft Office Word 2010 with 14-point Times New Roman

Font.

/s/ Alden L. Atkins

Alden L. Atkins
*Counsel for Southwest Airlines Co*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this the 5th day of June, 2015, the above and foregoing instrument was served on all counsel of record in this action using the United States Court of Appeals for the Second Circuit Electronic Case Filing ("ECF") System.


/s/ Alden L. Atkins

Alden L. Atkins
*Counsel for Southwest Airlines Co.*