# 15-1672

In The
## United States Court of Appeals
For The Second Circuit

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees*,

v.

AMERICAN EXPRESS COMPANY, *et al.*,

*Defendants-Appellants.*

(Full caption commences on inside cover)

On Appeal From the United States District Court
For the Eastern District of New York

**BRIEF OF DEFENDANTS-APPELLANTS
AMERICAN EXPRESS COMPANY AND
AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.
(PAGE PROOF)**

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
Cravath, Swaine & Moore LLP
Worldwide Plaza
   825 Eighth Avenue
     New York, NY 10019
      (212) 474-1000

Donald L. Flexner
Philip C. Korologos
Eric J. Brenner
Boies, Schiller & Flexner LLP
575 Lexington Avenue
   Seventh Floor
     New York, NY 10022
      (212) 446-2300

REDACTED PUBLIC VERSION

UNITED STATES OF AMERICA, STATE OF MARYLAND, STATE OF MISSOURI, STATE OF VERMONT, STATE OF UTAH, STATE OF ARIZONA, STATE OF NEW HAMPSHIRE, STATE OF CONNECTICUT, STATE OF IOWA, STATE OF MICHIGAN, STATE OF OHIO, STATE OF TEXAS, STATE OF ILLINOIS, STATE OF TENNESSEE, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF IDAHO, STATE OF RHODE ISLAND, *et al.*,

*Plaintiffs-Appellees*,

STATE OF HAWAII,

*Plaintiff*,

v.

AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,

*Defendants-Appellants*,

MASTERCARD INTERNATIONAL INCORPORATED, VISA INC.,

*Defendants*,

CVS HEALTH, INC., MEIJER, INC., PUBLIX SUPER MARKETS, INC., RALEY'S, SUPERVALU, INC., AHOLD U.S.A., INC., ALBERTSONS LLC, THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., H.E. BUTT GROCERY CO., HYVEE, INC., THE KROGER CO., SAFEWAY INC., WALGREEN CO., RITE-AID CORP., BI-LO LLC, HOME DEPOT USA, INC., 7-ELEVEN, INC., ACADEMY, LTD., DBA ACADEMY SPORTS + OUTDOORS, ALIMENTATION COUCHE-TARD INC., AMAZON.COM, INC., AMERICAN EAGLE OUTFITTERS, INC., ASHLEY FURNITURE INDUSTRIES INC., BARNES & NOBLE, INC., BARNES & NOBLE COLLEGE BOOKSELLERS, LLC, BEALL'S, INC., BEST BUY CO., INC., BOSCOVS, INC., BROOKSHIRE GROCERY COMPANY, BUC-EE'S LTD, THE BUCKLE, INC., THE CHILDRENS PLACE RETAIL STORES, INC., COBORNS INCORPORATED, CRACKER BARREL OLD COUNTRY STORE, INC., D'AGOSTINO SUPERMARKETS, INC., DAVIDS BRIDAL, INC., DBD, INC., DAVIDS BRIDAL CANADA INC., DILLARD'S, INC., DRURY HOTELS COMPANY, LLC, EXPRESS LLC, FLEET AND FARM OF GREEN BAY, FLEET WHOLESALE SUPPLY CO. INC., FOOT LOCKER, INC., THE GAP, INC., HMSHOST CORPORATION, IKEA NORTH AMERICA SERVICES, LLC, KWIK TRIP, INC., LOWE'S COMPANIES, INC., MARATHON

REDACTED PUBLIC VERSION

PETROLEUM COMPANY LP, MARTIN'S SUPER MARKETS, INC., MICHAELS STORES, INC., MILLS E-COMMERCE ENTERPRISES, INC., MILLS FLEET FARM, INC., MILLS MOTOR, INC., MILLS AUTO ENTERPRISES, INC., WILLMAR MOTORS, LLC, MILLS AUTO ENTERPRISES, INC., MILLS AUTO CENTER, INC., BRAINERD LIVELY AUTO, LLC, FLEET AND FARM OF MENOMONIE, INC., FLEET AND FARM OF MANITOWOC, INC., FLEET AND FARM OF PLYMOUTH, INC., FLEET AND FARM SUPPLY CO. OF WEST BEND, INC., FLEET AND FARM OF WAUPACA, INC., FLEET WHOLESALE SUPPLY OF FERGUS FALLS, INC., FLEET AND FARM OF ALEXANDRIA, INC., NATIONAL ASSOCIATION OF CONVENIENCE STORES, NATIONAL GROCERS ASSOCIATION, NATIONAL RESTAURANT ASSOCIATION, OFFICIAL PAYMENTS CORPORATION, PACIFIC SUNWEAR OF CALIFORNIA, INC., P.C. RICHARD & SON, INC., PANDA RESTAURANT GROUP, INC., PETSMART, INC., RACETRAC PETROLEUM, INC., RECREATIONAL EQUIPMENT, INC., REPUBLIC SERVICES, INC., RETAIL INDUSTRY LEADERS ASSOCIATION, SEARS HOLDINGS CORPORATION, SPEEDWAY LLC, STEIN MART, INC., SWAROVSKI U.S. HOLDING LIMITED, WAL-MART STORES INC., WHOLE FOODS MARKET GROUP, INC., WHOLE FOODS MARKET CALIFORNIA, INC., MRS. GOOCH'S NATURAL FOOD MARKETS, INC., WHOLE FOOD COMPANY, WHOLE FOODS MARKET PACIFIC NORTHWEST, INC., WFM-WO, INC., WFM NORTHERN NEVADA, INC., WFM HAWAII, INC., WFM SOUTHERN NEVADA, INC., WHOLE FOODS MARKET, ROCKY MOUNTAIN/ SOUTHWEST, L.P., THE WILLIAM CARTER COMPANY, YUM! BRANDS, INC., SOUTHWEST AIRLINES CO.

*Movants.*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendants-Appellants American Express Company and American Express Travel Related Services Company, Inc. certifies the following: American Express Company is the parent company of American Express Travel Related Services Company, Inc., and American Express Company is a publicly held company. Berkshire Hathaway, Inc., a publicly held corporation, owns more than 10 percent of the outstanding shares of American Express Company.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................iv

PRELIMINARY STATEMENT ..........................................................................1

JURISDICTIONAL STATEMENT ......................................................................7

STATEMENT OF THE ISSUES...........................................................................7

STATEMENT OF THE CASE...............................................................................8

STATEMENT OF FACTS ....................................................................................9

SUMMARY OF ARGUMENT ..........................................................................33

STANDARD OF REVIEW ................................................................................36

ARGUMENT ......................................................................................................37

I.     THE DISTRICT COURT ERRED IN FAILING TO EVALUATE THE
       EFFECTS OF THE NDPS ON OVERALL COMPETITION.....................37

       A.    Under the Rule of Reason, the Government Should Have Been
             Required To Prove That the NDPs Harm Overall Competition. ........38

       B.    The Case Law Does Not Support the District Court's Disregard of
             the "Overall Harm" Standard. ...........................................................46

       C.    The District Court's Cursory Treatment of the Effects on
             Cardholders from Removing the NDPs Magnified its Legal Error. ...51

II.    THE DISTRICT COURT ERRED, IN EXAMINING THE ALLEGED
       COMPETITIVE EFFECTS OF THE NDPS, BY DEFINING THE
       ONLY RELEVANT MARKET AS "NETWORK SERVICES". ................54

III.   THE DISTRICT COURT ERRED IN RELYING ON PRICING
       EVIDENCE TO FIND THAT THE NDPS HARM COMPETITION
       AND THAT AMEX HAS MARKET POWER. ...........................................58

A.    Evidence of "High" or Increasing Prices Is Insufficient To Establish That Prices Are Supracompetitive Without Evidence of Costs or Margins. ...............................................................59

B.    The Evidence Cited by the District Court Is Insufficient as a Matter of Law. ...................................................................65

IV.   THE DISTRICT COURT ERRED IN FINDING THAT AMEX HAS ANTITRUST MARKET POWER BASED ON THE "AMPLIFYING" EFFECT OF ITS CARDHOLDERS' "INSISTENCE" ...............................69

A.    We Can Find No Court That Has Found a Firm with Less Than 30 Percent Share of the Defined Market To Have Violated Section 1 Absent Evidence of Horizontal Collusion...........................................70

B.    The District Court's Finding That Amex Must Compete for Customer Loyalty By Continuously Offering Valuable Benefits To Cardholders Confirms the Absence of Amex's Market Power. ....72

V.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN DISREGARDING AMEX'S RIGHTS UNDER UNITED STATES V. COLGATE & CO. ............................................................80

CONCLUSION .....................................................................84

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216 (2d Cir. 1999) ................................................................................36, 74, 77

Anderson v. City of Bessemer City, N.C., 470 U.S. 564 (1985) ...........................36

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994) ......................................................55

Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc., 784 F.2d 1325 (7th Cir. 1986) ...........................................................................................................75

Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406 (7th Cir. 1995) .......................................................................................................62

Board of Trade of City of Chicago v. United States, 246 U.S. 231 (1918).............41

Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993) ...........................................................................................44, 45, 68

Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717 (1988) ...............................40

Cal. Dental Ass'n v. FTC, 526 U.S. 756 (1999) ......................................................51

Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc., 996 F.2d 537 (2d Cir. 1993) ........................................................................38, 83

Carpenter Tech. Corp. v. Allegheny Technologies Inc., No. 082907, 2011 WL 4528303 (E.D. Pa. Sept. 30, 2011) .............................................................61

CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74 (2d Cir. 1999) .....................43

Church & Dwight Co. v. Mayer Labs., Inc., 868 F. Supp. 2d 876 (N.D. Cal. 2012)..........................................................................................................67

City of New York v. Grp. Health Inc., 649 F.3d 151 (2d Cir. 2011) ......................55

Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50 (2d Cir. 1997) ........................78

iv

Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229 (2d Cir. 1999) .................................................................................36

Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp., 262 F. Supp. 2d 50 (S.D.N.Y. 2003) ...................................................................70

Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36 (1977) .........................39

Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373 (1911).............80

Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451 (1992) .................47

FTC v. H.J. Heinz Co., 246 F.3d 708 (D.C. Cir. 2001).........................................50

Geneva Pharms. Tech. Corp. v. Barr Labs. Inc. 386 F.3d 485 (2d Cir. 2004) ....................................................................passim

Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792 (1st Cir. 1988) .................................................................................76

Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374 (3d Cir. 2005) ................62

In re Ebay Seller Antitrust Litig., No. C 07–01882 JF (RS), 2010 WL 760433 (N.D. Cal. Mar. 4, 2010).......................................................62

In re Remeron Direct Purchaser Antitrust Litig., 367 F.Supp. 2d 675 (D.N.J. 2005)........................................................................62

Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984) .............................47

K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123 (2d Cir. 1995) ...........................................................................38, 41, 67

L.A.P.D., Inc. v. Gen. Elec. Corp., 132 F. 3d 402 (7th Cir. 1997).........................68

Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877 (2007)........37, 39

Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290 (2d Cir. 2008) .................................................................................48

Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984) .............................80

NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85 (1984)...........................54

PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101 (2d Cir. 2002) ............44, 60, 61, 68

PSI Repair Servs., Inc. v. Honeywell, Inc., 104 F.3d 811 (6th Cir. 1997)..............70

Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995)...................77

Reserve Supply Corp. v. Owens-Corning Fiberglas Corp., 971 F.2d 37
    (7th Cir. 1992)........................................................................................61

Times-Picayune Publishing Co. v. United States, 345 U.S. 594 (1953) ................48

Todd v. Exxon Corp., 275 F.3d 191 (2d Cir. 2001) ................................................38

Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90 (2d Cir. 1998)......................38

Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., No. 90-
    1547, 1991 WL 149249 (3d Cir. Aug. 9, 1991) .................................................76

Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000) .......................................72

United States v. Apple, Inc., No. 13-3741, 2014 WL 3953243 (2d Cir.
    June 30, 2015)........................................................................................37

United States v. Brown Univ. in Providence in State of R.I., 5 F.3d 658
    (3d Cir. 1993)........................................................................................49

United States v. Colgate & Co., 250 U.S. 300 (1919).................................8, 36, 80

United States v. Dentsply Int'l, Inc., 399 F.3d 181 (3d Cir. 2005) ..................50, 51

United States v. Eastman Kodak Co., 63 F.3d 95 (2d Cir. 1995)...........................75

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001) ...........................37

United States v. Philadelphia Nat'l Bank, 374 U.S. 321 (1963) ...........................49

United States. v. Topco Assocs., Inc., 405 U.S. 596 (1972) ...................................49

United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003) ....................passim

United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322
    (S.D.N.Y. 2001) ...............................................................................15, 46, 70, 72

Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656 (7th Cir. 1987) ......................................................................................71

Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004)...........................................................................45

Xerox Corp. v. Media Sciences, Inc., 660 F. Supp. 2d 535 (S.D.N.Y. 2009) ...................................................................................61

## Statutes & Rules

15 U.S.C. § 4 ...................................................................................7

15 U.S.C. § 1693o-2.........................................................................54

28 U.S.C. § 1291 ...............................................................................7

28 U.S.C. § 1331 ...............................................................................7

28 U.S.C. § 1337(a) ..........................................................................7

Fed. R. Civ. P. 52(a)...................................................................36, 37

## Other Authorities

Einer Elhauge, Defining Better Monopolization Standards, 56 Stan. L. Rev. 253, 332 (2003) ...................................................................69

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application......................68, 73, 75, 77

American Express Co. and American Express Travel Related Services Company, Inc. (collectively "American Express" or "Amex") appeal from the decisions of the District Court (Garaufis, J.) finding the Non-Discrimination Provisions ("NDPs") in Amex's merchant contracts unlawful restraints of trade under Section 1 of the Sherman Act (see SPA1-150) and permanently enjoining their enforcement (see SPA151-196).

## PRELIMINARY STATEMENT

As the District Court recognized, there are two joint consumers of Amex's services—the cardholder who wants to use the card, and the merchant that accepts it. Amex's core function is to bring together those two customers to consummate a single payment card transaction. Amex invests tremendous resources to attract merchants to accept its cards at their stores. Likewise, Amex provides billions of dollars in benefits to the consumers that carry its cards.

All of these investments have a critical purpose: to convince customers to obtain an Amex card and to use it—rather than the Visa or MasterCard that virtually every consumer also has—when they decide to make a purchase. In the words of the District Court, "the consumer's decision to pull an American Express card from his wallet at the point of sale represents a critical 'moment of truth' for the Company". SPA24. To reach that moment, Amex must win its cardholder's trust through the promise that merchants will welcome its

cards at the point of sale, but because Amex is not present at the point of sale, it is entirely dependent on the merchant to fulfill that promise. Visa and MasterCard have long understood this, and have sought to use their superior market power as the dominant firms in the industry to pressure merchants to "steer" cardholders toward their cards. As the District Court recognized, steering "endangers the cardholder's purchasing experience and therefore endangers the network itself". SPA24.

Amex has accordingly recognized since the 1950s that it needs contractual mechanisms—the NDPs—to ensure that merchants who agree to accept the Card do not, by steering, discriminate against Amex and undermine Amex's investment in its brand. The NDPs are non-price vertical restraints that prevent merchants—which also function as distributors of Amex's product—from reaping the benefits of accepting Amex cards while simultaneously damaging Amex's brand and Amex's relationship with its cardholders. The NDPs therefore serve a crucial competitive purpose. And absent monopoly, vertical restraints are generally lawful because they foster competition among producers. A plaintiff that seeks to have such terms condemned as anticompetitive, as the Government does here, thus is required under the first step of the rule of reason's burden-shifting framework to prove that the NDPs harm overall competition in the market. Only if the plaintiff makes that initial showing does the burden shift to the defendant to

offer a procompetitive justification for the NDPs.  See Geneva Pharms. Tech.

Corp. v. Barr Labs. Inc., 386 F.3d 485, 506-07 (2d Cir. 2004).

The Government failed to make a showing of overall harm to

competition, and the District Court erred as a matter of law by relieving it of its

burden of proof.  The Government's trial evidence that the NDPs create

competitive harm consisted largely of merchant witnesses who self-servingly

asserted that steering would allow them to negotiate lower prices for themselves.

The District Court accepted that evidence as sufficient, holding that "[p]roof of

anticompetitive harm to merchants, the primary consumers of American Express's

network services, is sufficient to discharge Plaintiffs' burden in this case".  SPA98.

However, as the District Court itself found, merchants are not the only

relevant consumers in this "two-sided" market.  Cardholders and merchants jointly

use Amex's services when they consummate a credit card transaction.  The rates

paid by merchants fund the services, benefits and rewards that Amex and other

card issuers provide to consumers; any reduction in merchant rates will necessarily

reduce those direct cardholder benefits and the differentiation of card products that

they foster.  As a result, the interests of merchants and cardholders are in tension:

Merchants may prefer lower fees, but cardholders want better services, benefits

and rewards funded by those fees.  Thus, the Government's burden was to prove

anticompetitive harm considering the impact on both sets of consumers, and in

3

order to do so it was required to prove either that the net price paid by both

merchants and cardholders is supracompetitive or that the NDPs have reduced

quality or output.  But the Government presented no such evidence.  To the

contrary, the evidence established that the existing merchant fees have led to

higher quality cards, better services, better rewards and dramatically increased

output.  If the merchants are paying more, it is because everyone is getting more.

Rather than protect competition in the market overall, the Government

decided as a matter of policy preference that merchants should pay lower credit

card fees even though that will result in a loss of cardholder benefits.  The District

Court agreed, and ruled that only the merchant interest in lowering credit card fees

is relevant to determining whether the Government has proved anticompetitive

effects.  But picking winners and losers that way is the province of regulators, not

courts.  And it is inconsistent with the fundamental purpose of the antitrust laws,

which is to protect competition for the benefit of <u>all</u> consumers, not to give priority

to one set over another.

In addition to its basic error of equating harm to merchants with harm

to overall competition, the District Court also erred in concluding that increases in

the rates Amex charges particular merchants showed that the NDPs are

anticompetitive.  As a matter of law, increased price levels alone—without

evidence of supracompetitive profit margins—cannot support a finding of market

4

power or anticompetitive effects. That is because a "high" price associated with the NDPs would be entirely consistent with vigorous competition on Amex's part to offer a superior and differentiated service. Here, the District Court explicitly found that there was no reliable evidence in the record concerning Amex's costs or margins. Particularly in a market where transaction volume (i.e., output) has exploded and cardholders receive more benefits than ever, the absence of any evidence of supracompetitive profit margins should have been fatal to the Government's case.

This is particularly true since Amex does not have the market power necessary to control market-wide output or price. Virtually every Amex cardholder also carries a Visa or MasterCard that will be accepted by any card-accepting merchant. The District Court conceded that Amex's low share—only 26 percent of the defined market—was insufficient on its own to establish market power. SPA71. But it determined that Amex had market power because its low share was "amplif[ied]" by cardholders' "insistence" on using their Amex cards. Id. That too was legal error. As the District Court (and the Government's economist) acknowledged, any "insistence" by Amex's cardholders depends on Amex continuously investing to provide them a high level of services, rewards and other valuable benefits. Competition for cardholders is fierce, and cardholders would switch away from Amex if Amex stopped providing superior benefits

5

compared to its competitors. In short, Amex only has the loyalty of its cardholders for so long as it competes on price by providing rewards, services, and other valuable benefits to cardholders. As a matter of law, customer preference that depends on reducing prices and maintaining favorable terms cannot constitute "durable" market power.

The business strategy that Amex has pursued, premised on the NDPs, has contributed to tremendous growth in output and innovation in the credit card market. The volume of credit card transactions has exploded, going from $1 trillion in the late 1990s to over $2 trillion as of 2011. See DX7828-10. These developments reflect the competitive pressure that Amex has placed on Visa and MasterCard by making enormous investments in cardholder benefits fueled by the merchant discount rate. In a prior suit against Visa and MasterCard, the Government held Amex's model out as a bulwark against the dominance of Visa and MasterCard and the only hope of driving product differentiation and interbrand competition that benefits consumers. It now seeks to condemn the business practices that make those benefits possible. The Government was right before and wrong today. Amex's business model, enabled by its NDPs, has been crucial to competition in the payment card industry, and the Government did not carry its burden to show otherwise. The judgment below should be reversed.

6

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this action under 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337(a). The District Court entered final judgment on April 30, 2015 (Dkt.640), and Amex filed a timely notice of appeal on May 21, 2015 (Dkt.664). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the District Court committed legal error by concluding that it need not consider the impact of the NDPs on the welfare of both sets of Amex consumers—merchants and cardholders—in analyzing whether there has been an adverse effect on overall competition under the rule of reason.

2. Whether, in evaluating the alleged anticompetitive effects of the NDPs under the rule of reason, the District Court committed legal error by defining the relevant market to exclude half of the relevant consumers.

3. Whether the District Court committed legal error in concluding that Amex's merchant discount fees are supracompetitive when the District Court acknowledged there was no reliable evidence concerning Amex's margins and costs.

4. Whether the District Court committed legal error in concluding that Amex had market power based on "customer insistence"—that is, brand loyalty

that is dependent on Amex's continuing to provide superior value to customers.

5.  Whether the District Court erred a matter of law in disregarding Amex's unilateral right under United States v. Colgate & Co., 250 U.S. 300 (1919), to refuse to enter into commercial agreements with merchants that seek to undermine its brand.

## STATEMENT OF THE CASE

On October 4, 2010, the Government filed a complaint against Amex, Visa and MasterCard, alleging in a single claim that Amex's NDPs and the analogous provisions of the other networks violated Section 1 of the Sherman Act. Dkt.1.  Visa and MasterCard simultaneously entered into consent decrees with the Government pursuant to which those networks agreed to cease enforcing the challenged rules and to notify all merchants that accepted Visa and MasterCard of their right to steer under the order.  Id.; Dkt.143.11.

The Government's Section 1 claim against Amex was tried before the District Court, sitting without a jury, beginning on July 7, 2014.  SPA7.  On February 19, 2015, the District Court issued a decision finding that Amex's NDPs violate Section 1.  SPA1-150.  On April 30, 2015, the District Court permanently enjoined Amex from enforcing the NDPs.  SPA151-70.  On May 19, 2015, the District Court denied Amex's request for a stay pending appeal, but granted a

30-day administrative stay of the Permanent Injunction to permit Amex to seek a

stay from this Court.  Dkt.663.  Amex filed a timely notice of appeal on May 21,

2015.  Dkt.664.  After denying Amex's motion for a stay pending appeal, this

Court ordered expedited briefing and oral argument.  2d.Cir.Dkt.104.

## STATEMENT OF FACTS

### *Key Features of the General Purpose Credit and Charge Card Industry*

This case is about competition in the general purpose credit and

charge ("GPCC") card industry.[1]  There are four primary GPCC networks in the

U.S.—Visa, MasterCard, Discover and Amex—and numerous banks that issue

GPCC cards to consumers.  As of 2013, Amex's share of GPCC transaction

volume was 26.4 percent.  SPA67.  Visa and MasterCard—long the dominant

networks in this industry—command a combined share of 68.3 percent.  Id.

Discover has a share of 5.3 percent.  Id.  Taken together, this transaction volume

represented approximately $2.4 trillion in 2013, an 8 percent increase from 2012

and a 30 percent increase from 2008.  SPA8; DX6576.1, 8.

---

[1] Although consumers routinely use debit cards interchangeably with credit and charge cards, the District Court excluded debit cards from the relevant market. SPA45-61.  References to "cards" throughout this brief refer to GPCC cards unless otherwise noted.

The key features and competitive dynamics of the GPCC industry relevant to this appeal were not disputed by the parties' economic experts and were acknowledged by the District Court in the decision below:

(i)     The core function of a GPCC network is to "facilitate transactions between merchants on one side and their customers on the other". Tr.3827:15-3829:3.  Thus, GPCC card networks compete against one another for transaction volume (i.e., the amount of money involved in GPCC transactions), which the District Court found to be "the most direct measure of output in this particular market", and which the District Court used in calculating the shares among the four principal networks.  SPA68.

(ii)    To compete for transaction volume, card networks such as Amex must "cater to the needs of two distinct sets of consumers, merchants and cardholders".  SPA5.  In fact, "[t]heir very function is to bring these two sides together to consummate value-generating transactions".  Id.  Economists describe GPCC card networks as operating in a "two-sided" market for transactions, where the network is a two-sided platform providing services directly to cardholders on one side and merchants on the other.  Id.

(iii)   Although GPCC networks are not the only example of a two-sided market—newspapers, for example, compete in a two-sided market consisting of readers on one side and advertisers on the other—they nonetheless have unique

10

competitive characteristics. "Importantly", card networks are "unlike many two-sided platforms" in that merchants and cardholders jointly and simultaneously consume the services provided by the card network. SPA11. That is, every time a cardholder makes a purchase using a GPCC card, both the merchant and the cardholder use the network "simultaneous[ly]" and "in fixed proportions" to consummate that transaction. SPA12. As the District Court put it: "for every unit of payment services sold to the cardholder at the moment of purchase, a matching service is sold to the merchant in order to execute the transaction, and vice versa". SPA11-12.

(iv)    The separate demands of cardholders and merchants for a network's services are "inextricably linked" and "intertwined". SPA42, 93. As a result, a GPCC network must account for what economists call "network effects": Unless cardholders want to use a network's cards for purchases, there is no reason for merchants to accept that network's cards. SPA12-13. By the same token, cardholders will not use a network's card unless it is widely accepted by merchants. As the District Court found, "in order to compete effectively, networks must account for the interdependence between the demands of each side of the platform and strike a profit-maximizing balance between the two". SPA13. And because "merchants' demand for payment card acceptance is largely derived from

11

consumers' demand for payment card usage", incentivizing cardholder usage of a network's cards is a critical part of striking that balance. SPA14.

(v) "[A] cardholder's experience at one merchant when using a particular network's card . . . affects that cardholder's willingness to use the same card on the next transaction, whether at the same merchant or a different merchant." SPA13. This is referred to as "spillover". Id. For example, if a major airline decided to stop accepting Amex cards, it would not only eliminate Amex's transaction volume at that airline, but would also reduce its transaction volume at numerous other merchants, as cardholders decided no longer to carry or to curtail using Amex for their general purpose spending. See Tr.4612:17-4613:17. Likewise, if that airline steered its customers away from Amex cards at the point of sale, that would not only reduce Amex's transaction volume with that airline, but also result in consumers using Amex's card less frequently even at merchants that do not steer, thus lowering the value of the network for merchants and consumers. See DX4104.'200.

(vi) The price received by card networks like Amex is also "two-sided". The merchant pays a fee to Amex called the "merchant discount" fee, which is usually calculated as a percentage of the purchase amount, called the merchant discount rate. SPA15. For any particular merchant, Amex generally charges the same discount fee for all of its cards. SPA18. By contrast, Visa and

12

MasterCard merchant fees not only vary by merchant segment, but also vary at each particular merchant depending on the type of card product the cardholder presents—in general, "high-rewards cards are subject to higher interchange rates and thus cost merchants more to accept". SPA18 (citing DX7295 (MasterCard table showing industry segments and card products)). As a result, when a Visa or MasterCard cardholder presents his card to a merchant, the merchant cannot readily ascertain the merchant fee associated with that particular card—even though many of those cards may cost the merchant more to accept than Amex. See Tr.438:8-10; Tr.5550:1-10.

But the merchant fee is only half the equation. Amex, in turn, provides significant benefits to cardholders for using their Amex cards—for example, cash rewards, airline miles, rental car insurance, fraud and purchase protection and other valuable services. SPA20; see also DX0447.'453 (Visa analysis of the "most appealing card features" among consumers). As the District Court found, "[c]ardholders effectively pay a 'negative' price" for Amex's services—a phenomenon that is not uncommon in two-sided markets. SPA91.n.36. And as the Government's expert, Professor Michael Katz, explained, when the value of cardholder rewards goes up, "that's equivalent to a price decrease" to the cardholder; "but it also follows the other way, that when the value of rewards goes down, . . . that corresponds to a price increase" to the cardholder.

13

Tr.6665:21-6666:3.  Thus, the price that Amex receives for its services is the <u>net</u> of those two payments—the merchant discount fee, which the merchants pay to Amex, <u>minus</u> the value of the benefits Amex provides to its cardholders. SPA85.n.30.

(vii)   There is a direct relationship between cardholder benefits and the merchant discount rate because the revenue from the discount rate (often called "discount revenue") funds the cardholder benefits.  SPA19, 21.  By way of illustration, if a merchant pays a 2 percent merchant discount rate to a card network on a $100 transaction, a large portion of the $2.00 in discount revenue paid by the merchant for that transaction is handed right back to the cardholder in the form of benefits.  SPA16, 20-21.

(viii)  As a result of this interdependence between the prices charged to merchants and cardholders—the two "sides" of the market—economists agree that one cannot determine the economic impact of particular market practices by assessing changes in price from the perspective of only one party to the transaction.  For example, as Professor Katz conceded, a reduction in the price to the merchant—which might seem procompetitive when assessed in isolation— "can harm consumers" by causing the network to reduce benefits to cardholders. Tr.4177:8-13.  Indeed, the District Court's opinion acknowledges repeatedly that

the merchant and consumer sides of the platform are "deeply interrelated",

"integrated" and "inextricably linked".  SPA5, 42, 79.

          (ix)    Thus, as Professor Katz explained, "what steering is all about is

the interaction between the two sides [of the platform] to make that joint decision

[of what payment instrument to use]", Tr.3834:15-17, and in evaluating the effects

of the NDPs, "[i]t is critical not to draw unwarranted and misleading conclusions

by focusing only on one side of a two-sided market".  Tr.3827:15-20.  Rather,

"an[y] assessment of market definition, market power and competitive effects

should account for the two-sided nature of the market" and the "inextricabl[e]"

connection between the two.  Tr.4018:2-19; <u>see also</u> SPA41, 42, 44, 93, 134.

***The Historical Dominance of Visa and MasterCard***

          Visa and MasterCard have long dominated the GPCC industry

because of their "structural advantages" in the marketplace.  SPA132.  As

described by this Court in <u>United States v. Visa U.S.A., Inc.</u> ("<u>Visa II</u>"), 344 F.3d

229 (2d Cir. 2003), <u>aff'g</u> 163 F. Supp. 2d 163 (S.D.N.Y. 2001) ("<u>Visa I</u>"), Visa and

MasterCard were until recently organized as joint ventures owned and operated by

a consortium of member banks.  <u>See</u> <u>Visa II</u>, 344 F.3d at 242.  Visa and

MasterCard do not issue cards or otherwise deal directly with cardholders; rather,

issuing banks—which historically were the owners of the Visa and MasterCard

joint ventures—issue cards under their own brand name (<u>e.g.</u>, a Chase Visa or

MasterCard) and are responsible for collecting funds from cardholders when they make purchases.  See Dkt.447-1.¶10.  Nor do Visa and MasterCard generally have direct relationships with merchants; merchants contract with independent merchant "acquirers," which pay the merchants and then collect the receivable from the issuing bank.  See id.

By contrast, for the vast majority of transactions, Amex both operates the Amex network and maintains direct relationships with cardholders (as the issuer) and merchants (as the acquirer).  SPA16, 42.

Visa and MasterCard's historical structure has given it a built-in advantage over Amex:  If a retail customer of a member bank (e.g., Chase Bank) wants a credit or charge card, the bank branch will issue a Visa or MasterCard. Indeed, as described below, until 2004, Visa and MasterCard prohibited member banks from issuing Amex cards.  Because of their ability to "leverage their existing banking relationships" with their customers, Visa and MasterCard have become ubiquitous in the market.  SPA132.  Professor Katz acknowledged that, even today, virtually every GPCC cardholder in the U.S. has either a Visa or MasterCard. Tr.4193:2-8.  The same is not true of Amex, which remains a "discretionary card for consumers" and thus has to make continual investments in its differentiated product to persuade cardholders to use Amex rather than their Visa or MasterCard. SPA72.

16

Amex's structural disadvantages relative to the dominant networks can be seen across a number of metrics:

| | Visa | MasterCard | Amex |
|---|---|---|---|
| Cards issued to consumers[2] | 254.1 million | 178.3 million | 53.1 million |
| Merchant acceptance locations[3] | 9.4 million | 9.4 million | 6.4 million |
| Number of transactions[4] | 12.79 billion | 6.36 billion | 4.46 billion |
| Transaction volume[5] | 45% | 23.3% | 26.4% |

As these figures demonstrate, there are about three million merchant locations—one out of every three—that have chosen not to accept Amex cards, proving that both consumers and merchants have a choice as to whether to use Amex's services.

***Amex's Differentiated Business Model Challenges Visa and MasterCard's Dominance***

Because Amex has both a smaller customer base and fewer merchant locations than Visa and MasterCard, and because virtually all Amex cardholders also carry a Visa or MasterCard, Amex has had to compete by providing special incentives for cardholders to use its card—a differentiated business model that emphasizes superior cardholder value over sheer ubiquity. As one Amex executive testified, in a market dominated by Visa and MasterCard, "you're either the biggest or you're the best", and Amex, foreclosed from being the former, has pursued a

---

[2] Dkt.447-1.¶18

[3] Dkt.447-1.¶22.

[4] DX6576.8.

[5] SPA67.

business strategy of striving to be the most attractive card for cardholders. SPA131.

When Amex entered the industry in 1958, it focused on charge cards for use at "travel and entertainment" ("T&E") merchants such as airlines, hotels and restaurants. SPA21. Its main competitors were Diners Club and Carte Blanche, which also targeted the T&E market segment. Id. Eventually, however, it became clear to Amex that cardholders had little interest in carrying a card that could be used only for limited purposes. Tr.4331:21-4332:25.[6] By the early 1980s, Amex's share was declining and its business viability was threatened. DX7828.50. As a result, Amex resolved to broaden its merchant base and appeal to consumers as a payment card choice not only at T&E merchants but also at so-called "everyday spend" merchants such as gas stations, supermarkets and pharmacies. SPA22; Tr.4334:11-4335:8, 4405:3-16.

To differentiate its product from that of its ubiquitous rivals, Visa and MasterCard and the banks who issue cards on those networks, Amex pursued a "spend-centric" model focused on higher-spending consumers who generally do not carry a balance, as compared to the "lend-centric" model pursued by the dominant networks and their issuers, which derives more than half its revenue from

---

[6] History vindicated that judgment; Diners Club and Carte Blanche have become irrelevant. Tr.6295:8-6296:22.

interest charged to cardholders.  SPA19.  As Amex executives explained at trial and the District Court found, Amex's model is a "key differentiator" in the services Amex provides to merchants:  Because Amex cardholders are "not carrying large balances and paying large interest fees" (Tr.3535:25-3536:6), they come to merchants "ready to spend" and "tend to spend more on average per transaction, spend more on an annual basis per card, and spend more often than cardholders on competitor networks".  SPA19, 87.

Critical to Amex's "spend-centric" model, Amex uses revenues from merchant discount fees to make substantial investments—including in rewards programs, superior customer service, fraud protection, and other benefits—to provide an incentive for cardholders to use their Amex cards rather than the alternative forms of payment that they also carry.  See SPA20 ("American Express's cardholder value proposition centers on the suite of rewards and other benefits the company provides to encourage cardholders to use their cards for purchases at Amex-accepting merchants.").  Most notably, Amex invests billions of dollars annually in its Membership Rewards program, through which cardholders receive points for purchases made with their Amex cards that they may redeem for goods and services.  See SPA20-21, 72.  As Professor Katz testified at trial, "[p]eople want to use their American Express cards because they get rewards and American Express operates a very attractive rewards program".  Tr.3962:6-16.

19

Because higher cardholder demand drives higher spending at merchants, Amex's investment in cardholder rewards benefits merchants as well. See SPA87 (finding that "American Express does, in fact, deliver on its differentiated value proposition to merchants in many respects", including by delivering "cardholders [that] tend to spend more on average per transaction"). In turn, as noted by a MasterCard report cited by the District Court, Amex's ability to charge a higher merchant discount rate reflects the superior value those higher-spending cardholders provide to merchants. DX7238.'378 (stating that Amex's "ability . . . to cater to the high-spending customer . . . "appear[s] to support [its] higher merchant discount rate") (cited at SPA19, 87.n.34).

### Visa and MasterCard's Attempts To Shut Down Amex's Competitive Threat

In the late 1980s, Visa and MasterCard viewed Amex's expansion of its innovative card offerings beyond the T&E segment as a major threat to the "bread and butter" of their business. SPA22. For example, a 1989 presentation to Visa's board said that "American Express has real advantages versus bank cards", and "even more" perceived advantages due to cardholders' favorable perception of Amex's brand. PX0132.'879. Visa also expressed concern that Amex's business model was "building a potential unmatchable tool for delivering merchant utility". PX0132.'882. Visa thus determined it "need[ed] to attack [Amex's] real and

20

perceived advantages" to "weaken [its] financial engine" and "keep Amex as a niche product". Id. at '880.  They did so by two means.

Foot First, in 1991 and 1996 respectively, Visa and MasterCard enacted their "Exclusionary Rules"—provisions in the bylaws governing the Visa and MasterCard joint ventures that prohibited member banks from issuing cards on the Amex (or Discover) networks.  SPA22.  These rules were later found to violate Section 1 of the Sherman Act in United States v. Visa.  Notably, in that case, the Government argued that the Exclusionary Rules harmed competition because they harmed Amex's differentiated business model, which was critical to competition in the GPCC card market.  See DX1191.90-91 (arguing, in its brief filed with this Court in Visa II, that "American Express and Discover have different strengths and weaknesses than Visa or MasterCard" and that the Exclusionary Rules harmed consumers by inhibiting those networks' ability to differentiate).  Indeed, the Government called Amex's CEO, Ken Chenault, to testify in its case-in-chief about Amex's differentiated business model and its importance to driving interbrand competition in the industry.  Tr.4322:10-4323:11 (Mr. Chenault testifying that Joel Klein, then the head of the DOJ's Antitrust Division, prepared him to "emphasize that American Express has a differentiated business model, because it's important to drive more competition in the market place").

21

This Court agreed. Describing the Exclusionary Rules as "a horizontal restraint adopted by 20,000 competitors [the issuing banks]", it held in Visa II that Visa and MasterCard harmed competition among networks as well as issuers by "absolutely prevent[ing] Amex and Discover from selling their products" and "seriously damag[ing]" Amex's ability to expand its share of the market. 344 F.3d at 242-43. As a result of the Court's decision, Visa and MasterCard eliminated the Exclusionary Rules, but their effects linger even today—as the District Court found, only nine banks issue cards on the Amex network, and those cards represent roughly one percent of Amex's annual charge volume. SPA17. By contrast, some ten thousand banks issue Visa and MasterCard cards. Tr.4295:16-21.

Second, Visa coupled its exclusionary rules with systematic campaigns designed to degrade Amex's brand and to "steer" cardholders to use Visa rather than Amex. In 1991, it launched an initiative known as "We Prefer Visa" to drive Amex back into its T&E niche and out of the remaining 70 percent of the market. Tr.3409:15-3410:7. Among other things, Visa pressured merchants to suppress usage of Amex cards by "[r]emov[ing] all American Express signage now visible to your customers at your point of sale" and "[t]rain[ing] your sales people to ask for a more profitable payment option". PX0082.'544. Visa did not merely encourage merchants to say they preferred Visa; it "strong armed" them by

22

threatening to raise prices on merchants who refused to comply.  PX1277.'095.

For example, according to a Discover document credited by the District Court,

Visa told numerous "[m]ajor merchants" that their rates would be "increased by

more than 20 basis points, but if they displayed 'we prefer VISA' signs and took

other actions [to support Visa's campaign], the amount of the increase would be

reduced".  Id.  Discover's President and CEO testified at trial that Wal-Mart

considered Visa's tactics to be "blackmail".  Tr.938:6-14.

     Illustrating the prevalence of spillover effects (supra at 12), Visa's

campaign led consumers to believe that merchants participating in the campaign—

and even Amex-accepting merchants that chose not to participate—did not accept

Amex cards at all.  See, e.g., DX7525.'382 (Amex marketing study, cited by the

District Court (SPA134.n.53), noting that 60 percent of Amex cardholders reported

that a "We Prefer Visa" sign "raise[d] doubts in their minds on whether Amex is

accepted").

### *Amex Uses the NDPs To Protect Its Brand Against the Dominant Networks' Anticompetitive Conduct*

     As the District Court found, Visa and MasterCard's "efforts were

remarkably effective".  SPA23; see also Tr.4338:9-4339:6 (Mr. Chenault

describing the Exclusionary Rules and "We Prefer" campaign as a "double choke

hold" on Amex).  Indeed, Amex's share of GPCC transaction volume dropped

precipitously from approximately 25 percent to 20 percent in just five years,

between 1990 and 1995.  SPA22-23 (finding that the "We Prefer Visa" "campaign

. . . appears to have contributed to a 25-45% shift in card volume from [Amex] to

Visa").

        The District Court succinctly described why "We Prefer Visa" was so

effective:  "Since the entire purpose of carrying a payment card is to enable the

consumer to consummate transactions with merchants, the consumer's decision to

pull an American Express card from his wallet at the point of sale represents a

critical 'moment of truth' for the company."  SPA24.  By steering a customer away

from a card, a merchant can undermine the investment in the brand; large-scale

steering causes broad, potentially fatal, injury to Amex's hard-earned brand equity.

See id. (steering "endangers the cardholder's purchasing experience and therefore

endangers the network itself").  The District Court refused to credit the trial

testimony of Mr. Chenault that Amex's ability to survive as a differentiated

business would be in peril if widespread merchant discrimination were permitted

because, according to the District Court, it is common for defendants in antitrust

cases to paint a portrait of doom to defend the case and there was no non-litigation

evidence to support the dangers to Amex of steering.  SPA137.  But in 1996,

nearly twenty years before this case was decided and more than ten years before it

was filed, Mr. Chenault made exactly the same point right in the midst of the Visa

24

"We Prefer" campaign, sounding the alarm and explaining within the Company that "[w]ithout welcome acceptance, the rest of our value proposition has only marginal value".  DX0319.'002 (cited SPA24).  And, as noted above, in the first five years of the Visa campaign, Amex lost a fifth of its entire U.S. transaction volume.

Amex responded to this threat by taking steps to protect its investment in cardholder loyalty, including by enhancing and enforcing the NDPs, which had been part of its card-accepting agreements in some form for decades.  SPA23. Specifically, Amex's standard-form NDPs provide that a merchant may not (1) "indicate or imply that [the merchants] prefer" another GPCC card over Amex; (2) "criticize . . . the Card or any of [Amex's] services or programs" or otherwise "try to dissuade Cardmembers from using the Card"; or (3) "impose any restrictions, conditions, disadvantages or fees when the Card is accepted that are not imposed equally on" other payment cards.  SPA25-26; PX0002.16.[7]  As Amex's witnesses testified repeatedly at trial, these NDPs create an environment in which Amex can invest in cardholder benefits knowing that that investment will

---

[7] Many large merchants have negotiated non-standard NDPs.  See SPA27.

not be undermined at the point of sale.  Tr.3066:4-3067:13; Tr.3771:24-:3772:25;

Tr.4477:12-20; Tr.4974:6-24; Tr.5833:3-17. [8]

***The Industry Today:  Robust Competition Enabled by Amex's NDPs***

Amex's investments in its differentiated product—which have been

enabled by the NDPs—have allowed it slowly, over a decade, to regain

approximately the share of transaction volume it had at the inception of Visa and

MasterCard's anticompetitive campaigns in the early 1990s.  DX7828-50.  More

important from the point of view of the antitrust laws, Amex has vindicated

Assistant Attorney General Klein's position in the Government's case against Visa

and MasterCard, that a stronger Amex benefits merchants and cardholders alike by

driving competition in this industry.

Amex's "spend-centric" model has changed the industry.  Despite

Visa and MasterCard's built-in structural advantages, Amex's differentiated

business model has spurred the dominant networks to enhance their own

---

[8] The NDPs do not prevent merchants from offering discounts for the use of cash, check, debit or automated clearing house ("ACH") transfers.  SPA26. Indeed, under federal legislation known as the Durbin Amendment, "merchants are legally entitled to use discounts or other in-kind incentives to encourage their customers to use a debit card, provided that the merchant does not differentiate between card issuers or the various debit networks".  SPA31.  As used in this brief, the NDPs also do not include certain unchallenged provisions that permit Amex to prevent merchants from "mischaracteriz[ing]" the Card or "engag[ing] in activities that harm [Amex's] business or the American Express brand (or both)".  SPA26.

cardholder rewards—fostering vibrant competition for cardholder spending and a substantial increase in transaction volume in the industry. SPA89 ("Beginning around 2006, for example, both Visa and MasterCard introduced new premium card categories . . . to enable issuers to more effectively compete with Amex's high-reward products."); supra at 9 (describing increased industry-wide output); see also Tr.3544:11-3545:7 (Amex executive testifying that "the rewards programs have gotten more robust and richer" and that more than 80 percent of all cards issued in the market, including Visa and MasterCard cards, "come with rewards").

### Visa and MasterCard Eliminate Their Equivalents to the NDPs—and Raise Prices To Merchants

While the initial complaint in this action named Visa and MasterCard as defendants, the Government announced the day it commenced this proceeding that those networks had agreed to a settlement in which they would abandon their own NDPs. In a competitive impact statement filed with the court below, the Government confidently predicted that the three million merchant locations where Amex is not accepted and thus were no longer subject to any network's NDPs would "benefit immediately" from the settlement. Dkt.5. The Assistant Attorney General even stated publicly that those merchants would quickly see lower transaction fees even as the litigation against Amex continued. See Tr.5111:19-5112:20.

But the Government's prediction was wrong:  Steering did not occur, and Visa's and MasterCard's fees at those merchants <u>increased</u> over that period. SPA123.  There was no valid reason to disregard a natural experiment that directly refuted the hypothesis on which the Government's case was based.  Neither of the District Court's justifications for doing so is consistent with the record.

<u>First</u>, the District Court believed that there was no evidence that the Government or Visa/MasterCard "took meaningful steps to alert these small business owners of their new freedom" to steer.  SPA124.  But that is simply wrong:  The very consent decree signed by the District Court required Visa and MasterCard to provide precisely that kind of notice to all of their merchants, including at the three million locations that do not take Amex.  Dkt.143.11-12.

<u>Second</u>, the District Court believed that the three million merchant locations are so "small" that the benefits of steering "may well" be outweighed by the costs of steering and that small merchants often have little direct contact with the GPCC networks.  SPA124.  It then speculated that merchants without such contact are less likely to steer.  <u>Id.</u>  In other words, the District Court concluded that steering is of little competitive benefit to "small" merchants.  But the evidence at trial also established that, to the extent the merchants represented by these three million locations are deemed "small", the same is true for 98 percent of the locations where Amex <u>is</u> accepted.  Tr.2947:4-12.

28

Given the failure of the Visa and MasterCard consent decree to deliver lower fees to merchants, the Government's own expert had no choice but to concede at trial that he had no idea if fees would go up or down if the NDPs were removed.  (Tr.4185:24-4186:20 ("Q. You testified before that it's possible that merchant fees would go up [in the but-for world], right?  A.  Following this case, yes.").  Despite Amex's repeatedly pressing it in its closing argument and post-trial submissions (see, e.g., Tr.6882:24-6883:3; Dkt.605.8), and despite its fundamental inconsistency with the District Court's conclusion that eliminating the NDPs and unleashing merchant steering will improve market conditions in this industry, this concession is entirely unmentioned in the District Court's opinion.[9]

***The District Court's Decision***

On February 19, 2015, the District Court issued an opinion finding that the NDPs violate Section 1 of the Sherman Act.  Recognizing that the NDPs are a non-price vertical restraint, the court purported to analyze the NDPs under the rule of reason's three-part burden-shifting framework, under which plaintiffs "bear an initial burden of demonstrating that the challenged restraints have had an 'adverse effect on competition as a whole in the relevant market.'"  SPA35

---

[9] Instead, the court accepted at face value the self-interested statements of a small, unrepresentative sample of merchants, hand-picked by the Government, who testified that "the market is broken" and that merchant discount rates might come down if they could steer.  SPA103.

(quoting Geneva Pharms., 386 F.3d at 506-07).  The District Court held that the

Government could discharge that burden in two ways:  (1) by proving that Amex

has market power in a properly defined market and showing that there are "other

grounds" to believe that the NDPs will cause competitive harm, or (2) by showing

directly that the NDPs cause competitive harm to overall market-wide competition.

Id.  The District Court concluded that the Government had discharged its initial

burden under both of these "two independent avenues".  Id.  It relied on three

findings to reach this conclusion, all of which focus on the impact of the NDPs on

merchants only and not on cardholders.

First, despite recognizing that GPCC networks operate in a two-sided

transaction market selling a service to cardholders and merchants simultaneously,

see supra at 10-15, the District Court defined the relevant antitrust market as

"GPCC network services", a market that specifically excludes cardholders.

SPA39-45.  The court explained that fully taking account of the two-sided nature

of the industry by including competition for cardholders in the defined market

would go "too far" and "frustrate" its analysis.  SPA41-42, 44-45.[10]

---

[10] The District Court rejected a second market proposed by the Government,
a so-called "price discrimination market" consisting of network services to a subset
of merchants in the T&E industry.  SPA61-65.  It also rejected Amex's argument
that the relevant transactions market includes debit cards.  SPA45-61.

Second, it concluded that Amex possesses market power in the network services market because it could raise prices to merchants. The District Court first determined that Amex's 26.4 percent "market share alone likely would not suffice to prove market power by a preponderance of the evidence". SPA71. Nonetheless, it held that Amex's modest share was "amplif[ied]" by the so-called "insistence" of Amex's cardholders—a portion of whom purportedly "insist on paying with their Amex cards and would shop elsewhere or spend less if unable to use their cards of choice". Id. The court held that this cardholder insistence supported a finding of market power over merchants even though it acknowledged that cardholders would stop insisting on using Amex cards if Amex stopped providing valuable cardholder services, rewards and other benefits or if other payment card networks offered even greater benefits. SPA78. Separately, the District Court held that certain of Amex's "pricing practices"—primarily, a program known as "Value Recapture", under which Amex increased the merchant discount rate charged to certain merchants after many years of flat or declining rates—also supported a finding of market power notwithstanding the absence of any evidence of Amex's costs or profit margins. SPA78-83.

Third, in finding that the Government had also shown competitive harm directly, the District Court continued to exclude competition for cardholders from its analysis, holding that "[p]roof of anticompetitive harm to merchants, the

31

primary consumers of American Express's network services, is sufficient to discharge Plaintiffs' burden". SPA98. It found that the NDPs harm merchants (i) by "remov[ing] the incentive for American Express or its network competitors to compete with one another by offering merchants a lower price" (SPA100-07), (ii) by blocking "low cost" business models in which a GPCC network—such as Discover, whose Chief Operating Officer testified as part of the Government's case-in-chief—could offer merchants lower discount rates in exchange for the merchants' steering to its network (SPA107-11) and (iii) by allowing GPCC networks to raise their prices to merchants (SPA111-14). Finally, despite having held that proof of harm to consumers was legally unnecessary, the court nonetheless purported to find that the NDPs also harm merchants' customers because merchants pass on higher merchant discount rates in the form of higher prices charged to all customers. SPA113-14.

After finding the Government's initial rule-of-reason burden satisfied, the District Court next conducted an abbreviated analysis concerning whether Amex had proffered a procompetitive justification for the NDPs. In doing so, it shifted to Amex the burden of disproving competitive harm to cardholders. It then dismissed Amex's showing that the NDPs were necessary to preserve Amex's ability to provide its differentiated product and a competitive bulwark against Visa and MasterCard—in essence, the identical argument about Amex's role within the

market that the Government itself made in <u>Visa</u>.  The court said Amex's justification was not "legally cognizable" because a restraint on interbrand competition "may [not] be justified under Section 1 because the defendant firm would be less able to compete effectively in its absence".  SPA129, 133.  The court went on to suggest in the alternative that, even if the procompetitive justification it attributed to Amex were legally cognizable, it was not supported by the evidence because Amex failed to prove that it "will cease to exist or be relegated to a niche competitor in the GPCC market" without the NDPs.  SPA137-38.  But, as discussed below, the court made no finding with respect to the impact of removing the NDPs on the quantity and quality of cardholder benefits.

## SUMMARY OF ARGUMENT

In ruling that the Government satisfied its burden under both of the "two independent avenues" for proving liability under the rule of reason, see <u>supra</u> at 30, the District Court committed multiple legal errors that cut across its doctrinal analysis, each of which requires reversal.[11]

---

[11] As explained below, Part II requires reversal of the Court's market definition; Parts III and IV require reversal of the Court's conclusion that Amex has market power; Parts I, III, and V require reversal of the Court's conclusion that the NDPs cause competitive harm.  While Amex asserts that the Government failed to meet its burden under either "independent avenue[]", it also preserves its contention that reversal of the finding as to Amex's market power alone warrants reversal of the judgment below because market power—the capacity to harm

33

<u>First</u>, the District Court erred as a matter of law in holding that "[p]roof of anticompetitive harm to merchants . . . is sufficient to discharge Plaintiffs' burden" to prove that the NDPs have anticompetitive effects. SPA98. Under this Court's precedents, the Government's initial burden under the rule of reason was to establish that the NDPs had an actual adverse effect on <u>overall</u> competition in the market as a whole. Here, the District Court found, and the Government's own expert agreed: (1) that Amex operates a two-sided platform in which merchants and cardholders jointly and simultaneously consume its service each time they consummate a transaction; (2) that the price Amex obtains is the <u>net</u> price charged to both cardholders and merchants; and (3) that the demand of cardholders and merchants is interdependent, with changes in price or demand on one side affecting price and demand on the other. <u>See</u> <u>supra</u> at 10-15. Given those undisputed facts, it was legal error for the District Court to hold that the Government could satisfy its burden without careful evaluation of the restraint's impact on both merchants and cardholders.

That basic error infected several steps of the Court's rule-of-reason analysis. Most fundamentally, in concluding that the Government had proven directly that the NDPs had caused competitive harm based only on its effect on

---

competition—is a prerequisite to a valid Section 1 claim analyzed under the rule of reason.

merchants, the Court relieved the Government of its burden to show that the NDPs harm <u>overall</u> competition.  (See <u>infra</u> Part I.)  Moreover, it was legal error for the District Court to define the relevant market as "network services to merchants" so as to exclude competition for cardholders from the analysis.  (See <u>infra</u> Part II.)  By deeming the interests of merchants paramount and excluding consideration of the interests of cardholders, the District Court essentially pre-ordained the outcome.

<u>Second</u>, the District Court committed an independent legal error in concluding that Amex's NDPs enabled it to charge supracompetitive merchant discount rates even though the court expressly acknowledged that the record was devoid of evidence of Amex's costs or margins.  Even assuming that the rate charged to merchants is independently significant (<u>but</u> <u>see</u> Parts I and II), those rates cannot as a matter of law be deemed supracompetitive without evidence relating to costs or margins, <u>Geneva Pharms.</u>, 386 F.3d 485 at 500.  The lack of such evidence thus should have been fatal to the Government's case.  This error infected both the District Court's conclusion that Amex had market power and its conclusion that Amex's NDPs caused competitive harm.  (See <u>infra</u> Part III.)

<u>Third</u>, the District Court's conclusion that Amex has market power over merchants was erroneous for the additional reason that its reliance on the so-called "amplifying" effect of Amex cardholder loyalty is contrary to settled antitrust principles.  Cardholder preference is not a cognizable source of antitrust

35

market power because it is ephemeral, not durable, and Amex must compete fiercely for it on the basis of replicable, procompetitive investments in cardholder benefits.  See AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 229 (2d Cir. 1999).  (See infra Part IV.)

    Fourth, the District Court committed legal error by disregarding Amex's unilateral right under United States v. Colgate & Co., 250 U.S. 300 (1919), not to deal with merchants that discriminate against its brand by attempting to steer cardholders to its competitors' cards.  That error infected both the District Court's analysis of competitive effects in the liability decision, which wrongly assumed that without the NDPs Amex would lack any means to prevent steering, and also its remedial decision, which unjustifiably deprived Amex of its rights under Colgate.  (See infra Part V.)

## STANDARD OF REVIEW

    The District Court's conclusions of law and its application of law to the facts are reviewed de novo.  Cofacredit, S.A. v. Windsor Plumbling Supply Co., 187 F.3d 229, 238 (2d Cir. 1999).  The District Court's findings of fact are reviewed for clear error.  Fed. R. Civ. P. 52(a).  Findings of fact are "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed".  Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573

(1985) (internal quotation marks omitted).  Moreover, "[t]he mandatory nature of

Rule 52(a) does not compel [the Court] to accept fact-findings that result from the

District Court's misapplication of governing law or that otherwise do not permit

meaningful appellate review".  United States v. Microsoft Corp., 253 F.3d 34,

81-82 (D.C. Cir. 2001).

## ARGUMENT

## I.   THE DISTRICT COURT ERRED IN FAILING TO EVALUATE THE EFFECTS OF THE NDPS ON OVERALL COMPETITION.

The District Court's determination that the NDPs violate Section 1 of

the Sherman Act should be reversed because the District Court failed to hold the

Government to its burden of proving that the challenged restraints harm overall

competition.  The NDPs are "vertical agreements . . . between parties at different

levels of [a] market structure", United States v. Apple, Inc., No. 13-3741, 2014

WL 3953243, at *17 (2d Cir. June 30, 2015) (internal quotation marks omitted)—

here, American Express and merchants who choose to accept Amex cards.  Such

vertical agreements are "properly analyzed under the rule of reason," SPA33, an

inquiry which "[i]n its design and function . . . distinguishes between restraints

with anticompetitive effect that are harmful to the consumer and restraints

stimulating competition that are in the consumer's best interest".  Leegin Creative

Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007).

### A. Under the Rule of Reason, the Government Should Have Been Required To Prove That the NDPs Harm Overall Competition.

To prevail in a Section 1 rule-of-reason case, a plaintiff is required to prove that the challenged restraints have "an <u>actual</u> adverse effect on competition <u>as a whole</u> in the relevant market" by raising prices to supracompetitive levels, or lowering quality or output below competitive levels. <u>K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.</u>, 61 F.3d 123, 127 (2d Cir. 1995) (emphasis added) (finding no adverse effect absent evidence "that defendants' actions adversely affected service, quality or price market-wide"); <u>see also</u> <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 214 (2d Cir. 2001) (Sotomayor, J.); <u>Tops Mkts., Inc. v. Quality Mkts., Inc.</u>, 142 F.3d 90, 96 (2d Cir. 1998); <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.</u>, 996 F.2d 537, 546 (2d Cir. 1993). "[T]he overarching standard is whether defendants' actions diminish overall competition, and hence consumer welfare." <u>K.M.B.</u>, 61 F.3d at 128 (internal quotation marks omitted). If the plaintiff makes this showing, then—and only then—the burden shifts to the defendant to offer a procompetitive justification for the restraint. <u>Capital Imaging</u>, 996 F.2d at 547 (procompetitive "justifications are unnecessary where . . . the plaintiff . . . has not carried its own initial burden of showing a restraint on competition").

Amex's NDPs limit the ability of merchants that choose to accept the Amex card to discourage use of the Amex card at the point of sale. The reason is plain: When a merchant discourages use of the Amex card, it undermines Amex's efforts to deliver "welcome acceptance" to its cardholders, which not only discourages use of the card at that merchant's point of sale but which may also discourage its use at other merchants. SPA13. Merchants effectively function as distributors of Amex's services by making the Amex network available to cardholders. When a merchant that chooses to accept American Express nevertheless discourages its use, it reflects badly on the brand and undermines Amex's other usage-promoting investments. Tr.4357:9-4358:4.

In this regard, the NDPs are like other vertical restraints that secure the loyalty of distributors and retailers to protect the producer's brand. Such vertical restraints—including restrictions on pricing and territorial restrictions—frequently displease distributors and retailers, because they impact the profitability of their sales. See Leegin, 551 U.S. at 881-85 (rejecting retailer's claim that manufacturer's setting minimum retail price violated Section 1 per se); Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 57-59 (1977) (rejecting retailer's claim that manufacturer's territorial restriction violated Section 1 per se). Restraints in otherwise competitive markets are treated as benign because they reflect and reinforce strong interbrand competition among manufacturers, which is

39

"the primary concern of antitrust law". <u>See</u> <u>Bus. Elecs. Corp. v. Sharp Elecs. Corp.</u>, 485 U.S. 717, 725-727 (1988).

Because the NDPs affect competition for cardholder usage, the Government's initial burden should have been to show that the challenged restraints made all consumers of the relevant credit card service—cardholders and merchants—worse off overall because they engaged in fewer credit card transactions, or paid more for those transactions, than they would have in a market without the NDPs. The District Court erroneously relieved the Government of that burden.

<u>First</u>, the District Court should not have allowed the Government to satisfy its burden of proving anticompetitive effects simply by showing that merchants would pay lower merchant discount rates absent the NDPs. The District Court's own factual findings explain why. As the District Court found, card networks face two-sided competition: "[I]n order to compete effectively, networks must account for the interdependence between the demands on each side of the platform and strike a profit-maximizing balance between the two." SPA13. As a result, competing effectively in this market requires a complex balancing of the interests of cardholders and merchants. SPA13-14. Merchant fees fund benefits to cardholders, which in turn allow Amex to deliver a significant benefit to merchants as well, because Amex cardholders spend more than the average Visa or

MasterCard card user. On the other hand, if Amex charges merchants too much, merchants will refuse to accept Amex—as millions already do—or will deny Amex other opportunities (for example, participation in various types of reward programs, see PX1033.'151-52), undermining Amex's efforts to encourage cardholder usage. Indeed, the Government's own expert agreed that "it [is] incorrect to think that the effects of interchange fees on consumer welfare can be understood by looking solely at the merchant side of the market". Tr.4175:20-25.

Rather than account for these "facts peculiar to the business", Board of Trade of City of Chicago v. United States, 246 U.S. 231, 238 (1918), the District Court elevated merchant interests above those of cardholders. It first concluded (erroneously, as discussed above) that removing the NDPs would cause the discount rate charged to merchants to decrease. On that basis—and on that basis alone—the District Court assumed that this result would be procompetitive and consumer-welfare-enhancing because, in its view, "[p]roof of anticompetitive harm to merchants, the primary consumers of American Express's network services, is sufficient to discharge Plaintiffs' burden in this case". SPA98. But the fact that a particular restraint (supposedly) leads to higher merchant fees does not say anything about whether it "diminish[es] overall competition, and hence consumer welfare". K.M.B., 61 F.3d at 128 (emphasis added; internal quotation marks omitted). If the same restraint leads to enhanced cardholder benefits that exceed

41

any supposed increase in merchant fees, consumers—and overall competition—are better off.  Under the District Court's logic, however, the NDPs would still be anticompetitive in such a scenario, even if removing the NDPs would harm cardholders more than it would benefit merchants.

Had the District Court applied the correct legal standard, it would have been clear that the Government failed to carry its burden of proof of harm to overall competition, properly taking into account both merchants and cardholders. As the court acknowledged, the Government failed to "present[] a reliable measure of American Express's two-sided price that appropriately accounts for the value or cost of the rewards paid to cardholders".  SPA112; see also SPA85.n.30.  The District Court also expressly found that the Government failed to present, and the record did not provide, reliable evidence of Amex's economic margins.  See, e.g., SPA84 (finding that "Plaintiffs have not provided a reliable measure of American Express's per transaction margins"); see also infra Part III.  Without evidence of either the two-sided net price or Amex's costs or profit margins, it was impossible for the District Court to conclude that a reduction in the merchant discount rate would benefit merchants without harming cardholders through reduced benefits and services.   In sum, the District Court had no basis to find that the NDPs harmed overall competition by raising the net price for each transaction to supracompetitive levels, or by reducing quality or output below competitive levels.

42

Second, the District Court's failure to demand proof of a net adverse effect on price and quality was particularly inappropriate given that the trial evidence indisputably showed that output has increased.  The District Court confirmed that the NDPs "restrain[] one form of interbrand competition among [credit] card networks in favor of alternative forms of interbrand competition".  SPA34; see also SPA134.  Those "alternative forms of competition" are "fierce", and include, "among other things, securing lucrative co-brand deals, signing corporate card clients, and offering cardholders ever more robust suites of rewards and other ancillary benefits intended to induce them to spend on a particular card".  SPA134-35.  In other words, rather than enlisting merchants to steer at the point of sale, credit card companies must attract cardholder spend by providing incentives to cardholders directly.  And it is precisely that competition—directly for cardholders—that has led to dramatically increased transaction volume, which the District Court itself acknowledged is the proper measure of output (supra at 10).

This evidence of increased output is indicative of a highly competitive market—and consistent with the evidence demonstrating (and the Government's prior position in Visa) that Amex's differentiated model, supported by the NDPs, has fueled competition in this industry, not reduced it.  See, e.g., CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 80 (2d Cir. 1999) ("[I]f competitors can reach the ultimate consumers of the product . . . it is unclear whether [exclusive dealing

43

arrangements with distributors] foreclose from competition *any* part of the relevant market." (internal quotation marks omitted)); PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 111 (2d Cir. 2002) (loyalty provisions with independent food distributors had no "significant anticompetitive effect on . . . price or output").

      The antitrust laws are concerned with restraints that artificially raise overall prices and thereby reduce quality and output. See, e.g., Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 237 (1993) ("Where, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand. Under these conditions, a jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level."). That is not happening here. On the contrary, the record is clear that people are using credit cards more often than ever before. See supra at 9. The quality of those cards and the benefits that come with them are higher than ever before. See SPA89, 134-35. And this outcome is supported by the existing pricing structure whereby merchant discount rates support investments that spur competition for credit card transactions. Given that evidence, the court violated basic tenets of antitrust law in holding that it could find anticompetitive effects by looking only at the merchant discount rate—half the relevant price—and ignoring the effects of the NDPs on overall price, quality and output in the market.

44

As the Supreme Court has recognized, the cost of mistakenly striking a procompetitive restraint is high, as both competition and consumers suffer. See Brooke Grp., 509 U.S. at 227 (noting that "mistaken inferences" may be "especially costly, because they chill the very conduct the antitrust laws are designed to protect" (internal quotation marks omitted)); see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 413-14 (2004). Here, the District Court acknowledged that it lacked the experience and expertise necessary to regulate the complex GPCC market. SPA4. It acknowledged that the competitive effects of the NDPs were not "obvious". SPA33-34.n.7. And it acknowledged that competition in the market—reflected by dramatically increased cardholder usage—is "fierce[]". SPA134-35. In that context, the court's unjustified intervention, based on a truncated view of the dynamics of the industry, risks sheltering Amex's competitors from the competition they most fear—competition for consumer spending—and making all consumers worse off. By improperly relieving the Government of its burden to show harm to overall competition, and deeming the NDPs anticompetitive based on mere speculation about the supposed harm to merchants alone, the District Court's decision invites that undesirable result.[12]

---

[12] The Government also never explained why—even assuming the NDPs lead to higher merchant fees (an assumption belied by reality at the three million

## B. The Case Law Does Not Support the District Court's Disregard of the "Overall Harm" Standard.

None of the cases cited by the District Court supports its conclusion that the Government need not prove nor evaluate the impact of the NDPs on cardholder benefits before concluding that the NDPs are anticompetitive.

First, the District Court suggested it was simply following the lead of the Visa decisions—by relieving the Government of its obligation to prove an adverse effect of the NDPs on consumers. SPA41. That is wrong. Visa I held the exact opposite, explaining that "***the ultimate impact of any harm to system level competition is felt by cardholders and merchants*** who use or accept general purpose charge cards". 163 F. Supp. 2d at 339 (emphasis added). And it went on to consider the overall impact of the challenged restraint on both merchants and cardholders. See id. at 382-83; see also id. at 379 (finding that "the record demonstrates that the exclusionary rules have had an adverse effect on both the

_____

merchant locations not subject to NDPs)—those purportedly higher fees would not be invested into the benefits that fuel the existing fierce competition for cardholder spend. The Government—and the District Court—also ignored the fact that Visa and MasterCard have every incentive to use merchant steering to reduce competition on the cardholder side. As it did during the "We Prefer Visa" campaign, Visa can use its superior market power to strong-arm merchants into promoting the Visa card simply by threatening to increase its prices. See supra at 22-23. And the evidence at trial revealed that many Visa and MasterCard cards are more expensive for merchants than Amex, so steering based on GPCC network— rather than a particular card—cannot reliably direct cardholders to a card with lower fees. See supra at 13.

issuing and the network market").  In affirming, this Court emphasized both of those findings:  "The district court found that [the] exclusionary rules harm competition by 'reducing overall card output and available card features,' as well as by decreasing network services output and stunting price competition."  Visa II, 344 F.3d at 240; see also id. at 239 ("Whereas in the market for general purpose cards, the issuers are the sellers, and the cardholders are the buyers, in the market for general purpose card network services, the four networks themselves are the sellers, and the issuers of cards and merchants are the buyers.").  The District Court thus legally erred by misinterpreting both decisions in Visa when it said that it had "[found] plaintiffs satisfied their initial burden with regard to the network services market by showing a likelihood of harm to merchants" alone.  SPA99.

Visa makes clear that how one labels the relevant product market—whether it is a single, two-sided market for transactions or two interrelated markets for "network services" and "cardholder services"—cannot artificially dictate the scope of competition that is considered in the competitive-effects analysis.  This approach is consistent with the Supreme Court's teaching that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law".  Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 466-67 (1992); see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 18 (1984) (explaining that any "inquiry into the validity" of

47

a challenged restraint "must focus on the market or markets" in which the restraint operates (emphasis added)); cf. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 338 (2d Cir. 2008) (Sotomayor, J., concurring) (noting that joint ventures "are typically evaluated as a whole under the rule of reason because the competitive effects of an individual restraint are intertwined with the effects of the remainder of the venture"). And this rejection of artificial limits in evaluating whether overall competition has been harmed is especially critical in the context of this two-sided industry, where, as the Government's economist acknowledged, "you can have one two-sided market, or you can talk about two one-sided markets as long as you keep track of those two markets and how they interact". Tr.4017:8-11.

Second, Times-Picayune Publishing Co. v. United States, 345 U.S. 594 (1953), also does not support the District Court's decision to relieve the Government of its obligation to prove harm to overall competition. There, the Court ruled in favor of the defendant on market power, and thus did not need to examine competitive effects at all, much less address whether the Government had to prove adverse effects across interdependent markets. Id. at 610-11. In addition, as the District Court itself recognized, "unlike many two-sided platforms"—including the newspapers in Times-Picayune—"American Express provides [its] services simultaneously; for every unit of payment services sold to the cardholder

48

at the moment of purchase, a matching service is sold to the merchant in order to execute the transaction, and vice versa".  SPA11-12.

Third, the District Court cited cases for the proposition that "a restraint that causes anticompetitive harm in one market may not be justified by greater competition in a different market".  SPA135 & n.54.  However, those cases are off point because they deal with underline horizontal restraints,[13] and the proposition for which they were incorrectly cited is inconsistent with the Second Circuit requirement that adverse effects must be analyzed looking at underline overall competition. In fact, we have not found any case in which a court condemned a vertical restraint as anticompetitive while ignoring its competitive effect in an "interrelated" or "intertwined" market.

Fourth, the District Court cited FTC v. H.J. Heinz Co., 246 F.3d 708, 719 (D.C. Cir. 2001), for the proposition that "no court has ever held that a

---

[13] United States. v. Topco Assocs., Inc., 405 U.S. 596 (1972), involved a per se illegal horizontal conspiracy.  The District Court quoted a passage that simply noted that the court's inability to weigh competitive effects in different "sector[s] of the economy" is one of the justifications for per se rules.  Id. at 609-10.  United States v. Brown Univ. in Providence in State of R.I., 5 F.3d 658 (3d Cir. 1993), involved a horizontal conspiracy relating to financial aid; the court said such an agreement could not be justified on the basis of potentially increasing competition in entirely separate areas such as curriculum, campus activities and student-faculty interaction.  United States v. Philadelphia Nat'l Bank, 374 U.S. 321 (1963), involved a proposed merger between competing commercial banks, and the court rejected the bank defendant's arguments about competition outside the geographic market.

reduction in competition for wholesale purchasers is not relevant unless the plaintiff can prove impact at the consumer level". But its misapplication of Heinz, which involved a merger that would have eliminated competition at the wholesale level, only confirms its legal error. Merchants and cardholders may be in a wholesaler-consumer relationship with respect to the goods the merchant sells. But with respect to the transactions facilitated by a card network, they are joint consumers of payment card services. See supra at 10-15.

Fifth, the District Court cited United States v. Dentsply Int'l, Inc., 399 F.3d 181 (3d Cir. 2005), without explanation as to how that case supports its conclusion. It does not. Dentsply was an exclusive dealing case involving the U.S. market for prefabricated artificial teeth. Manufacturers of the teeth, including Dentsply, typically sold them to dealers, which in turn sold them to the ultimate consumers (dental laboratories which used them to make dentures). Id. at 184. Manufacturers also sometimes sold the teeth directly to the dental laboratories. Id. at 185. The issue was whether Dentsply's exclusive dealing agreements resulted in substantial foreclosure of competitors from the market. Id. at 185-86. The Third Circuit held that in assessing whether the exclusive dealing arrangement resulted in substantial foreclosure from the market, the District Court erred by looking only at foreclosure from the end consumers (the laboratories), when it should also have looked at foreclosure from dealers. See id. at 190. But nothing in the case justifies

50

the District Court's approach of limiting its analysis to only one of the two sets of

relevant customers; to the contrary, <u>Dentsply</u> holds that it should have looked at

both. <u>Id.</u> at 190.

### C. The District Court's Cursory Treatment of the Effects on Cardholders from Removing the NDPs Magnified its Legal Error.

As explained above, the District Court never considered the key

question raised by the Government's argument:  How would elimination of the

NDPs affect competition in the overall market, including cardholders and

merchants?  In light of this failure, its cursory discussion of the effect of the NDPs

on cardholders was insufficient to cure its legal error in relieving the Government

of its burden of proof.

<u>First</u>, the District Court addressed competition on the cardholder side

only as a "procompetitive justification", and concluded that "Defendants have

failed to establish that the NDPs are reasonably necessary to robust competition on

the cardholder side of the GPCC platform".  SPA134.  That allocation of the

burden of proof is inconsistent with the antitrust rule of reason:  The District Court

improperly "shift[ed] a burden to [American Express] to adduce hard evidence of

the procompetitive nature of its policy".  <u>Cal. Dental Ass'n v. FTC</u>, 526 U.S. 756,

776 (1999).  It is impossible to determine whether the NDPs have an

anticompetitive effect—that is, whether the Government has satisfied its initial

burden under the rule of reason—without examining what will happen to cardholders in the event that merchant discount fees decrease. The court's view that "neither party has presented a reliable measure of American Express's two-sided price that appropriately accounts for the value or cost of the rewards paid to cardholders", SPA112 (emphasis added), should have been fatal to the Government's case. The court's misallocation of the burden of proof amounted to a determination that the Government should prevail.

Second, the District Court approached cardholder competition as if the only issue were whether American Express would cease to exist if the NDPs were removed. SPA136-41. In doing so, the District Court completely failed to address the more important issue: the impact of a reduction in merchant discount rates on cardholder welfare and competition.

Third, the District Court's suggestion that merchants might pass through any cost reductions caused by elimination of the NDPs to their customers, SPA121, was insufficient to satisfy the applicable legal standard of measuring the overall consumer welfare effects of the NDPs. Even if the court were correct that there would be some level of pass-through, the court never even attempted to quantify it, nor what reduction in cardholder benefits would accompany any reduction in transaction fees charged to merchants.

Fourth, the District Court suggested that the NDPs promote the welfare of American Express cardholders at the expense of customers who choose to use other payment products such as cash. SPA114 ("[A] lower-income shopper who pays for his or her groceries with cash or through Electronic Benefit Transfer . . . is subsidizing . . . the cost of the premium rewards conferred by American Express on its relatively small, affluent cardholder base."). And the court treated that "externality" as "another anticompetitive effect of Defendants' NDPs". Id. There are two problems with this approach.

As an initial matter, this purported pass-through externality is not an "effect" of the NDPs because "American Express's NDPs do not . . . restrict merchants from steering customers to cash, check, or ACH transfers". SPA30. Even with the NDPs in place, merchants can charge lower prices to consumers who pay with other payment forms (such as the consumer paying with "cash or through Electronic Benefit Transfer") and thereby eliminate any purported "subsidy". Indeed, as the District Court noted, some merchants do just that. Id. (noting that, under the NDPs, "gas stations are able to offer customers a lower price per gallon of gasoline if the customer pays in cash as opposed to using a credit or charge card").

Moreover, even if this externality existed, addressing that sort of an effect is a matter for regulation—such as the provisions of the Durbin Amendment

53

that authorize merchants to reduce their prices for payments in cash, see 15 U.S.C.

§ 1693o-2; that supposed wealth distribution effect has no relevance to whether the

NDPs are unlawful under the antitrust laws.  NCAA v. Bd. of Regents of Univ. of

Okla., 468 U.S. 85, 104 (1984) ("Under the Sherman Act the criterion to be used in

judging the validity of a restraint on trade is its impact on competition.").  The

District Court's discussion of this issue confirms that its approach to analyzing this

case was a regulatory approach of choosing one business model that favors

merchants over another that favors cardholders, rather than assessing the overall

effects of the challenged restraint on competition.  But nothing in the antitrust laws

supports such a preference.

## II.     THE DISTRICT COURT ERRED, IN EXAMINING THE ALLEGED COMPETITIVE EFFECTS OF THE NDPS, BY DEFINING THE ONLY RELEVANT MARKET AS "NETWORK SERVICES".

As discussed above, the District Court's most fundamental error was

its refusal to hold the Government to its burden of proving harm to overall

competition.  As the preceding section demonstrates, the Government was required

to prove net harm to cardholders and merchants regardless of whether the relevant

market was defined specifically to include cardholders.  In other words, this Court

need not even reach the question of market definition to reverse the decision

below.

But the District Court also committed legal error in recognizing that it needed to "take account" of the effects of the NDPs on cardholders—who are one half of each GPCC transaction—and then nevertheless defining the market as "network services" so as to exclude those consumers. This provides an additional, alternative, ground for reversal.

This Court's decisions establish that the entire point of defining relevant markets is to take into account the spectrum of competition that is impacted by the challenged restraint. See, e.g., City of New York v. Grp. Health Inc., 649 F.3d 151, 158 (2d Cir. 2011) (noting that "the applicable case law requires plaintiffs asserting a claim under the Sherman Act . . . to allege a market in which the challenged merger will impair competition"); Balaklaw v. Lovell, 14 F.3d 793, 799 (2d Cir. 1994) ("The basic principle is that the relevant market definition must encompass the realities of competition." (internal citation and quotation marks omitted)). It makes no sense to exclude from the definition of the relevant market one of the two joint consumers that is directly affected by the challenged restraint.

The District Court's only support for this approach was to cite the decisions in Visa. But, as discussed above in Part I.B, those decisions in fact defined two relevant markets—a card market in which cardholders are the customers as well as a market for network services—specifically so that it could

55

examine the competitive effects of the challenged restraint in <u>both</u> markets. <u>See,</u> <u>e.g.</u>, <u>Visa II</u>, 344 F.3d at 238-39. While neither the District Court nor this Court in <u>Visa</u> used the terminology of a two-sided market, the outcome was the same: Both merchant and consumer welfare were taken into account through the definition of two interrelated markets.

The District Court's error in excluding cardholders from the relevant market is confirmed by the way it actually analyzed market definition, market power and competitive effects. As defined by the District Court, "network services" are nothing more than the technical infrastructure services provided by card networks to process transactions. SPA 15-16. But there was almost no evidence at trial about what "network services" are or how they are priced. To be clear, the price for network services is <u>not</u> the merchant discount rate. The Government's expert pointed to one document—which was not even admitted into evidence—that he said showed that networks charge ███ basis points (<u>i.e.</u>, ███ ███ percent of the value of each transaction) for network services. Tr.3915:12-17; PX2702.56 (demonstrative exhibit accompanying Professor Katz's trial testimony). But that is just a small fraction of the merchant discount rate, which is typically more than 200 basis points (2 percent). DX7538.'969. There was no evidence at trial concerning any changes in the price of network services, and certainly no evidence that any such changes were or were not related to the NDPs.

56

In fact, the District Court did not even purport to examine how Amex's NDPs affect the price of "network services". Instead, its (flawed) competitive effects analysis focused on the full merchant discount rate, not the fees associated with "network services". See, e.g., SPA119 (removing the NDPs would "result in lower swipe fees charged to merchants"). But the full merchant discount rate is the fee to process "transactions" as a whole (including cardholder rewards and other benefits)—the very market the District Court rejected. Similarly, the court found that the primary source of Amex's purported market power is cardholder insistence (see infra at Part IV)—which comes from the issuing side that the court excluded by defining a narrow network services market.

In short, the District Court: (1) recognized that each GPCC transaction requires a cardholder, which constitutes one-half of each transaction; (2) acknowledged that the NDPs regulate merchant conduct that directly affects cardmembers at the point of sale; (3) found that Amex and other networks must simultaneously balance the needs of both cardholders and merchants to compete effectively; (4) relied on evidence of cardmember loyalty as the "source" of Amex's market power; and (5) looked only to the price for the entire transaction (the merchant discount rate) as support for finding market power and anticompetitive effects. Yet, in the face of those findings, the District Court

specifically defined the market to <u>exclude</u> cardholders, on the ground that

including them would "go too far" and "frustrate the court's analysis".  SPA40-42.

The fact that including the full scope of competition and all relevant

consumers in the relevant market—as required by this Court's precedent—would

"frustrate" the District Court's analysis by requiring it to hold the Government to

its burden of proving harm to overall competition is no basis to support a flawed

market definition.  Rather, it reveals that the court's entire approach to analyzing

this case was legally flawed.

## III.  THE DISTRICT COURT ERRED IN RELYING ON PRICING EVIDENCE TO FIND THAT THE NDPS HARM COMPETITION AND THAT AMEX HAS MARKET POWER.

As set forth in the previous two sections, the District Court erred by

relieving the Government of its burden of proving that Amex's NDPs harm overall

competition.  But even assuming <u>arguendo</u> that the District Court was correct in

holding that cardholder interests do not matter to the Government's threshold

burden, the District Court's opinion would still require reversal because it hinges

critically on legally insufficient conclusions about Amex's merchant prices.  The

District Court found that the NDPs harm competition by forcing merchants to pay

higher prices than they otherwise would, and it found that Amex has market power

because it increased prices during its Value Recapture initiative without losing a

significant number of merchants.  <u>See, e.g.</u>, SPA79 (finding that Value Recapture

58

"increased prices that were already at or above the competitive level"); SPA111 (finding that the NDPs "aided [Amex's] efforts to profitably raise its discount rates on merchants accounting for 65% of the network's annual U.S. charge volume as part of its Value Recapture initiatives in the late 2000s").

However, the District Court also found that there was no reliable evidence in the trial record relating to Amex's costs and margins, regardless of whether one looks at just the so-called network services fee charged to merchants or the "all in" merchant discount rate. SPA84. As a matter of well-settled antitrust law, that finding precluded the District Court from concluding that Amex's prices are supracompetitive. Because the District Court's market power and competitive effects rulings turn on its legally invalid conclusions regarding Amex's prices, those rulings must be reversed.[14]

### A. Evidence of "High" or Increasing Prices Is Insufficient To Establish That Prices Are Supracompetitive Without Evidence of Costs or Margins.

It is a well-settled principle of antitrust law that a court cannot conclude that a defendant's prices (or market prices more generally) are supracompetitive without evidence relating to the defendant's costs or profit

---

[14] The court's conclusion that Amex's merchant discount rates are supracompetitive formed one of the two bases for its finding that Amex has antitrust market power—the other being "cardholder insistence," which is addressed in Part IV below. See SPA71-78.

margins.  For example, in Geneva Pharmaceuticals, plaintiffs tried to prove that

Barr Labs ("Barr") exercised market power in the generic warfarin sodium market

by demonstrating that it charged elevated prices.  This Court, however, found that

evidence "at best ambiguous".  386 F.3d at 500.  "[A]bsent . . .  any analysis of

Barr's costs," this Court said, "we do not know whether the allegedly elevated

prices led to an abnormally high price-cost margin".  Id.  The Court thus held that

this pricing evidence was insufficient as a matter of law to establish that Barr had

market power.

Likewise, in PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101 (2d Cir.

2002), Pepsi brought suit under Sherman Act Sections 1 and 2 challenging certain

"loyalty" provisions that prevented independent food distributors ("IFDs") that

sold Coca-Cola fountain-soda products from also distributing competing Pepsi

products.  In claiming that Coca-Cola had market power, Pepsi argued that

distribution of soda through IFDs was cheaper than alternative channels of

distribution, and Coca-Cola's control of the IFD channel thus gave it the

opportunity to charge supracompetitive prices.  This Court rejected that argument,

however, "because no evidence was proffered to establish that it is cheaper for

Coca-Cola to deliver fountain soda through IFDs [i.e., that Coca-Cola's costs were

lower] than through other delivery methods".  Id. at 108.  In the absence of such

evidence, Pepsi could "not create a triable issue with respect to whether Coca-Cola charges supracompetitive prices". Id.

Xerox Corp. v. Media Sciences, Inc., 660 F. Supp. 2d 535, 549-50 (S.D.N.Y. 2009), which applied this Court's holdings in Geneva Pharmaceuticals and PepsiCo, is likewise instructive. There, in the context of a Section 2 monopolization claim, Media Sciences argued that Xerox had charged supracompetitive prices based on evidence that Xerox had "raised [printer] ink-stick prices three times, yet cannot point to any changes in its cost structure that would justify such an increase". Id. at 549. The court, however, held that under this Court's precedents that evidence was insufficient as a matter of law to avoid summary judgment, because Media Sciences had no affirmative evidence that Xerox obtained "an abnormally high price-cost margin" or that "Xerox's low costs resulted in consumers being charged supracompetitive prices". Id. Numerous other cases are in accord. See, e.g., Reserve Supply Corp. v. Owens-Corning Fiberglas Corp., 971 F.2d 37, 52 (7th Cir. 1992) (rejecting argument that Owens-Corning obtained supracompetitive profits because Reserve "offer[ed] no evidence, such as studies on the comparative costs of production or on market conditions, to indicate that these profits were above those available in a competitive market"); Carpenter Tech. Corp. v. Allegheny Technologies Inc., No. 082907, 2011 WL 4528303, at *12 (E.D. Pa. Sept. 30, 2011) ("[T]o support a claim that defendants

61

set supracompetitive prices, antitrust plaintiffs must provide an analysis of the

defendant's costs, and show that the defendant had an 'abnormally high price-cost

margin' and that they 'restricted output.'" (quoting <u>Geneva Pharms.</u>, 386 F.3d at

500)); <u>In re Ebay Seller Antitrust Litig.</u>, No. C 07–01882 JF (RS), 2010 WL

760433, at *5 (N.D. Cal. Mar. 4, 2010) ("Evidence that eBay has raised prices over

a period of years, and that several of its employees believe that the company may

have raised them too high, proves nothing with respect to whether the prices are

supracompetitive.").

   As these cases recognize, evidence of price increases (or allegedly

"high" prices) is perfectly consistent with a well-functioning, competitive market.

"Competitive markets are characterized by both price and quality competition, and

a firm's comparatively high price may simply reflect a superior product."  <u>Harrison

Aire, Inc. v. Aerostar Int'l, Inc.</u>, 423 F.3d 374, 381 (3d Cir. 2005).  As a result, "a

reasonable finder of fact cannot infer monopoly power just from higher prices".

<u>Blue Cross & Blue Shield United v. Marshfield Clinic</u>, 65 F.3d 1406, 1411-12 (7th

Cir. 1995); <u>accord</u> <u>In re Remeron Direct Purchaser Antitrust Litig.</u>, 367 F.Supp. 2d

675, 681 n.10 (D.N.J. 2005) ("[W]ithout evidence that sheds light on material

factors such as price relative to its total costs (marginal <u>and</u> fixed) and whether

output was restricted, monopoly power cannot be found as a matter of law.").

Under these settled principles, the District Court committed reversible legal error because it repeatedly acknowledged the absence of any reliable record evidence of Amex's costs or margins—either as to its "network services fee" or to its "all-in" merchant discount rate.  As to the former, the District Court specifically found that the Government had failed to adduce any reliable evidence of the costs of Amex's network services.  In support of its argument that the District Court should define a separate T&E submarket (an argument the court rejected), the Government offered two analyses performed by Professor Katz that were designed to show Amex's "price-cost margin on network services across multiple merchant segments".  SPA63.  Professor Katz's first methodology relied on "internal data from American Express" that he said purported to measure "Amex's revenue less its variable costs on each dollar of charge volume".  SPA63 (referring to this as the "contribution margin").  The second "attempted to approximate American Express's margins" by taking its "average [merchant] discount rate" in each industry, and then subtracting [its] third-party 'issuer rate,'" which Professor Katz argued was a proxy for Amex's costs.  SPA64.

In both cases, however, the District Court correctly called Professor Katz's analyses "flawed" because they did not isolate the costs associated with Amex's network services, as opposed to other aspects of Amex's GPCC business.  SPA63-64 (finding that the internal Amex data used by Katz "[did] not distinguish

between Amex's various business lines" and thus improperly "include[d] revenues and costs associated with [Amex's] issuing business, not just the network services business"); accord id. at 64 (stating that the second methodology also "fail[ed] to disaggregate Amex's various lines of business"). The absence of any evidence regarding Amex's costs for network services thus left it without "a reliable measure of American Express's per transaction margins across its industry groups". SPA84.

As to the all-in merchant discount rate, the District Court likewise found that the record lacked reliable evidence of Amex's overall costs of providing credit card services. As discussed above (see supra at 14) , it is undisputed that Amex pays a large percentage of the discount rate to cardholders in the form of benefits. Yet, as noted above, the District Court acknowledged that the Government had failed to introduce any evidence regarding the value or costs of rewards. See SPA85.n.30 ("[T]he evidentiary record does not include a reliable measure of the two-sided price charged by American Express that correctly or appropriately accounts for the network's expenses on the cardholder side of the platform."); SPA112 ("[N]either party . . . presented a reliable measure of American Express's two-sided price that appropriately accounts for the value or costs of the rewards paid to cardholders."). The District Court also found that

Professor Katz's profit-margin analysis was "flawed" because it "fail[ed] to account for the network's fixed costs". SPA63.

### B. The Evidence Cited by the District Court Is Insufficient as a Matter of Law.

The absence of any reliable evidence of Amex's costs should have been fatal as a matter of law to the Government's claims of market power and competitive harm, and renders the District Court's conclusion that Amex's prices are supracompetitive legally invalid under Geneva Pharmaceuticals and its progeny. The District Court's resort to other evidence to support its conclusions regarding Amex's merchant prices does not cure the fatal lack of evidence relating to costs and margins, which was conceded by the District Court and is required under Second Circuit law to support a finding of supracompetitive price.

First, citing Professor Katz, the District Court said that Amex's Value Recapture initiative "increased prices that were already at or above the competitive level". SPA79. That is pure ipse dixit: As explained above in Part III.A, the court admittedly did not have any evidence of margins or costs on which to conclude reliably that Amex's prices were already supracompetitive. The sole explanation offered by Professor Katz for his conclusory assertion was that Amex's prices must have been supracompetitive because they were higher than those of Visa and MasterCard, which were "found to have market power" in a "concentrated"

market.  Tr.3985:3-15.[15]  At the outset, however, the District Court did <u>not</u> accept

the Government's evidence that Amex charges a premium to Visa and MasterCard

but instead indicated that there was "conflicting" evidence on whether any

premium still exists.  SPA85; <u>see also</u> SPA86 (crediting evidence that Amex's

premium over Visa and MasterCard has fallen to less than 0.1 percent); SPA88

(acknowledging that "Amex's premium plainly has eroded over time").  Moreover,

as the District Court itself correctly observed:  "That American Express may

charge a higher price to merchants than Visa and MasterCard, two firms previously

found to possess market power in the relevant market, is not necessarily proof that

such prices are supracompetitive; merchants may be receiving commensurate value

for the higher price, similar to the manner in which Lamborghini and Toyota both

sell cars, but the former can charge a higher price because it offers a differentiated,

and ostensibly superior, product."  SPA84-85.  Indeed, as the District Court noted,

Amex's primary justification for the Value Recapture price increases was that its

prices had not kept up with the improvements it had made to its card products and

services prior to 2005.  SPA86.

> Second, the District Court also suggested that the absence of merchant

attrition during the Value Recapture price increases was sufficient to show that

---

[15] Professor Katz also cited the NDPs themselves, which he said "further elevated the prices" to merchants, Tr.3985:14, but that reasoning is circular.

Amex's prices are supracompetitive even without evidence of margins or costs.
See SPA81 ("Although American Express's decision to adjust its pricing in
response to perceived increases in its costs on either side of its integrated platform
is not itself evidence of market power, the company's ability to profitably impose
such price increases across a broad swath of its merchant base with little or no
meaningful buyer attrition is compelling proof of such power." (internal citations
omitted)).  That is wrong as matter of law.  Without evidence of costs or margins,
evidence of rising prices, even without losing sales, is equally consistent with
healthy competition and lends no support for the conclusion that Amex exercised
market power or harmed competition.  See K.M.B., 61 F.3d at 129 ("Market power
has been defined as the ability to raise price significantly above the competitive
level without losing all of one's business." (emphasis added) (internal quotation
marks omitted)); Church & Dwight Co. v. Mayer Labs., Inc., 868 F. Supp. 2d 876,
897 (N.D. Cal. 2012) (rejecting argument that Church & Dwight's "ability to raise
prices without suffering lower sales" constituted evidence of market power),
vacated in part on other grounds, No. C-10-4429 (EMC), 2012 WL 1745592 (N.D.
Cal. May 16, 2012).

Third, with respect to competitive effects, the District Court tried to
minimize the significance of the lack of price data by referring generally to
"economic theory" and pointing to a quote from American Express's Chief

67

Financial Officer that essentially said nothing more than that American Express earns a profit. SPA112. If that were sufficient, then every company that reports an accounting profit would have supracompetitive prices. See Tr.4103:25-4104:14 (Professor Katz acknowledging the distinctions between economic and accounting profits).

        Fourth, the undisputed evidence of increased output during the period of the Value Recapture price increases confirms the District Court's legal error. According to the Government's own expert, Professor Katz, Amex's output increased significantly during the Value Recapture period, from less than $300 billion to more than $400 billion. See PX2702.4. "Where, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand." Brooke Grp., 509 U.S. at 237. Antitrust law does not condemn price increases in those circumstances. Rather, "[a]ntitrust law is designed to protect consumers from the higher prices—and society from the reduction in allocative efficiency—that occurs when firms with market power curtail output". L.A.P.D., Inc. v. Gen. Elec. Corp., 132 F. 3d 402, 404 (7th Cir. 1997) (emphasis added); see PepsiCo, 315 F.3d at 107-108 (defining market power as "'the ability to raise price by reducing output.'" (emphasis added) (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ("Areeda") ¶ 501)); see also PX2702.75

("Restricted output is a hallmark of the exercise of market power.").  Moreover,

any restriction on output by Amex harms consumers only if it limits output market-

wide, see, e.g., Einer Elhauge, Defining Better Monopolization Standards, 56 Stan.

L. Rev. 253, 332 (2003), but output among all GPCC networks also rose

dramatically during that time—from less than $1.6 trillion in 2005 to nearly $1.9

trillion in 2010.  PX2702.41; see also DX7828.10.  This uncontested evidence is

indicative of vigorous competition, not a firm that is restricting supply in order to

reap supracompetitive profits.

## IV. THE DISTRICT COURT ERRED IN FINDING THAT AMEX HAS ANTITRUST MARKET POWER BASED ON THE "AMPLIFYING" EFFECT OF ITS CARDHOLDERS' "INSISTENCE"

It would be extraordinary to conclude that a firm with only a 26

percent share of the relevant market possesses antitrust market power.  Thus, the

District Court properly recognized that Amex's market share is insufficient on its

own to support a finding of market power.  See SPA71.  But it erred by concluding

that Amex has market power notwithstanding this modest share by relying on two

categories of evidence.[16]  One was Amex's so-called "pricing practices".  SPA78-

---

[16] The District Court claimed it was applying Visa I in finding that Amex has antitrust market power based on these two categories of evidence, but that is wrong—the court in Visa I examined and relied on a number of factors not present here in concluding that MasterCard and Visa possessed market power.  For example, the Visa I court's market power decision turned heavily on its finding of price discrimination, whereas the District Court here found no evidence of price

84.  That reliance was error for the reasons described in the preceding section. That leaves only the second category:  so-called "insistence", Amex's cardholder loyalty, which the District Court said "amplif[ied]" Amex's market share and was a concept "critical" to its analysis.  See SPA71-78.  The District Court's resort to cardholder loyalty to bootstrap Amex's low share into a finding of market power constitutes an independent legal error requiring reversal.

### A.  We Can Find No Court That Has Found a Firm with Less Than 30 Percent Share of the Defined Market To Have Violated Section 1 Absent Evidence of Horizontal Collusion.

Amex's low market share is a red flag that counsels against a finding that Amex has market power.  As far as we can determine, no court in any circuit has ever found that a firm violated Section 1 with a share of the relevant market below 30 percent absent proof of horizontal collusion, and courts in this Circuit have recognized that "firms with market shares of less than 30% are presumptively incapable of exercising market power".  Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp., 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) (internal quotation marks omitted; citing cases); see also PSI Repair Servs., Inc. v. Honeywell, Inc.,

---

discrimination.  Compare Visa I, 163 F. Supp. 2d at 340-41 with SPA83-84.  The Visa I court also cited direct evidence of actual exclusion of competition, a cornerstone of market power.  Id. at 341, 382.  There is no such evidence here. And with respect to pricing evidence, the Visa court devoted only a single sentence to price increases whereas price increases are a principal driver of the District Court's market power analysis here. See id. at 340.

70

104 F.3d 811, 818 (6th Cir. 1997) ("A thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power."); <u>Valley Liquors, Inc. v. Renfield Importers, Ltd.</u>, 822 F.2d 656, 666 (7th Cir. 1987) ("A 20%-25% market share or less does not constitute market power.").

The District Court read <u>Visa II</u> to indicate that Amex's market share nonetheless "suggests" that Amex possesses market power.  SPA71.  In <u>Visa II</u>, however, this Court affirmed the district court's finding that MasterCard had market power with a market share of 26 percent in the context of analyzing exclusionary rules that were a product of horizontal collusion among the thousands of MasterCard (and Visa) member banks.  344 F.3d at 240 (finding market power in part based on Visa and MasterCard's ability to "preclud[e] their largest competitor", Amex, from access to issuing banks).  Moreover, as this Court explained, the same issuing banks "owned and effectively operated" both Visa and MasterCard.  <u>Id.</u> at 242.

Indeed, in <u>Visa II</u>, the government asserted that any comparison by defendants between MasterCard's 26 percent market share and Amex's market share, which at the time was approximately 20 percent, was a "red herring" because of these key differences among the networks.  DX1191.59-60.[17]  As the

---

[17] In fact, in post-trial submissions in <u>Visa I</u>, the Government even went so far as to argue that the ability of Amex to increase its share to 25 percent from 20

Government urged in Visa II, MasterCard had a significantly larger merchant

acceptance network, DX1191.60—a gap that remains today, see supra at 17, and,

according to the District Court, continues to pose a "competitive disadvantage" for

Amex, SPA94.  In addition, MasterCard (and Visa) continue to have far more

cards in circulation than Amex.  Cf. Visa I, 163 F. Supp. 2d at 341.[18]

    **B.**    **The District Court's Finding That Amex Must Compete for Customer Loyalty By Continuously Offering Valuable Benefits To Cardholders Confirms the Absence of Amex's Market Power.**

        The District Court found that a 26 percent share of the defined market

supported a finding of market power because of "the amplifying effect of

cardholder insistence".  SPA71.  This conclusion was legal error.

---

percent through bank partnerships would be a procompetitive outcome. DX0765.¶¶370-373; Visa I, 163 F. Supp. 2d at 342 (endorsing Government's position).

[18] Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000), also cited by the District Court, is similarly inapposite.  Toys "R" Us, which had 20 percent of the retail toy market, and up to 49 percent in some geographic markets, "orchestrated a horizontal agreement among its key suppliers," toy manufacturers accounting for 40 percent of the market, to boycott low-price toy warehouse stores.  Id. at 930-32, 37 (emphasis added).  Market power was thus unnecessary because the boycott was unlawful per se.  Id. at 936.  Moreover, because the competitive harm caused by the boycott was foreclosure of the warehouse stores' access to toy suppliers, the court's discussion of market power "in the alternative" focused on the market share of the horizontally colluding manufacturers—40 percent—not on Toys "R" Us's 20 percent retail market share.  Id. at 936-37.

First, the District Court found that the "most important[]" "source[]" of Amex's cardholder insistence is its investments in "the robust rewards programs offered by the network". SPA72; see also SPA72.n.25 (quoting Professor Katz as recognizing "Amex's 'very attractive rewards program'" as "'the big source of insistence' for most Amex cardholders"). As the court found, were Amex to reduce those rewards, any cardholder "insistence" would quickly dissipate. See SPA78 ("Of course it would."). Indeed, at trial, Professor Katz illustrated this principle with a vivid analogy: Just as "dogs are loyal . . . only as long as you're feeding them", cardholders are "insistent" only as long as they keep getting their rewards. Tr.4163:11-4164:21.

That evidence shows that Amex must compete on price in order to attract customers; it does not show that Amex has market power, which is the power to increase price to supracompetitive levels. As both parties' experts agreed, cardholder benefits effectively reduce the net price Amex receives for its services. See supra at 13. As Professor Katz explained, when the value of cardholder rewards goes up, "that's the equivalent to a price decrease" to the cardholder. Tr.6665:21-6665:23. A firm that can attract customer loyalty only by reducing its prices does not have the power to increase prices unilaterally, which is the type of power condemned by the antitrust law. Areeda ¶ 501 ("[A] firm that can exclude rivals only by charging the competitive price does not have significant

73

market power.").  Contrary to the District Court's conclusion, the evidence that

Amex obtains cardholder loyalty by decreasing its price confirms that Amex <u>lacks</u>

market power.

        Moreover, the District Court found Amex's rivals "fiercely compete

to . . . capture share of wallet by . . . offering cardholders ever more robust suites of

rewards".  SPA134-35.  Visa and MasterCard have dramatically increased the

benefits offered by their own cards (thus lowering their own net price) in an effort

to compete for cardholder purchase volume.  <u>See</u> SPA89; <u>see also</u> Tr.3544:11-

3545:6 (discussing Visa and MasterCard's introduction of high-rewards cards).

These benefits—including cashback rewards—are provided to a wide population

of consumers.  They show that the investments Amex makes to create a loyal

cardholder base can be replicated by its competitors; there are no barriers to

existing competitors competing for the loyalty of Amex's cardholders by offering

even more attractive card features and benefits.  <u>See</u> SPA78 (acknowledging that

Amex's ability to attract cardholders "requires continual and replicable

investment").  Cardholder insistence based on replicable investments cannot create

"durable" market power under the antitrust laws, because the ability of Amex's

rivals to lure away its cardholders continually requires Amex to provide superior

value to its customers and constrains its ability to raise its prices.  <u>See</u> <u>AD/SAT,</u>

<u>Div. of Skylight, Inc. v. Associated Press</u>, 181 F.3d 216, 229 (2d Cir. 1999)

(quoting Areeda ¶ 506d) ("[T]ransitory power may safely be ignored by antitrust law. The social costs of antitrust intervention (including its error potential) are likely to exceed the gains when market forces themselves would bring the defendant's power to an end fairly quickly."); Geneva Pharms., 386 F.3d at 500 ("[A] transitory advantage does not significantly harm competition and therefore should not violate § 1."); Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc., 784 F.2d 1325, 1335 (7th Cir. 1986) (finding health insurer had no market power, despite large market share, because "other firms may duplicate the [insurer's] product at the same cost the [insurer] incur[s]").

Contrary to the District Court's reasoning, this Circuit and others have held that brand loyalty and consumer preference are insufficient to establish antitrust market power. For example, in United States v. Eastman Kodak Co., 63 F.3d 95 (2d Cir. 1995), the Government argued (as it did here) that Kodak's market power was demonstrated, among other things, by a consumer survey indicating that "50 percent of surveyed consumers will only buy Kodak film, while another 40 percent of consumers prefer Kodak film but are willing to purchase another brand". Id. at 107 (internal quotation marks omitted). The Second Circuit rejected the Government's position and held that Kodak lacked market power despite the evidence of consumer loyalty. See id. at 108 (rejecting "the government's contention that the strong preferences of United States customers for Kodak film

75

demonstrates Kodak's market power in the United States" in light of other evidence); see also Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., No. 90-1547, 1991 WL 149249, at *6 (3d Cir. Aug. 9, 1991) ("Nor is intense brand loyalty sufficient to presume market power."), aff'd en banc, 959 F.2d 468 (3d Cir. 1992); Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792, 797 (1st Cir. 1988) (Breyer, J.) ("[V]irtually every seller of a branded product has some customers who especially prefer its product. But to permit that fact alone to show market power is to condemn ties that are bound to be harmless, including some that may serve some useful social purpose.").[19]

---

[19] Addressing these cases, the District Court acknowledged at the summary judgment stage that "brand loyalty, even of the type that results in undeniably high market share, does not equate to market power", but concluded that the cases were inapplicable because they involve one-sided markets whereas here the Government's market power allegations are premised on brand "loyalty on the consumer side of [a] two-sided market". Dkt.369.19-20. According to the District Court, the distinction is that in Kodak, consumers were found to be "price sensitive, and could easily purchase film from one of the company's competitors", whereas in this case, merchants purportedly "do not choose how much of Amex's services they purchase". Dkt.369.20. The District Court offered no explanation or rationale as to why this purported distinction matters, and never even discussed the issue in its liability decision. In fact, the court's attempt to distinguish these precedents highlights the District Court's selective reliance on the two-sidedness of the GPCC market: On one hand, the court refused to account for competition on the consumer side of the market as an element of the Government's case, but on the other hand it cited the two-sided nature of the market to find that brand loyalty created market power.

Second, the District Court erroneously concluded that Amex cardholders' insistence could "be a source of durable market power" because of the barriers to a new network entering the market. See SPA70, 77-78 (noting "the lack of any meaningful entry into the market since 1985", when Discover launched its network). But there was no justification for the court to focus only on new entry and to ignore competition by existing competitors. See AD/SAT, 181 F.3d at 226-27 (recognizing that market power requires the ability to "persist" in pricing above the competitive level "without erosion by new entry or expansion" (quoting Areeda ¶ 501)). Competition by existing market participants is equally if not more potent in constraining the ability of a firm to raise its prices to supracompetitive levels. See id. (describing as the "usual obstacle[] to market power "the presence of numerous rivals who can and will expand their output to satisfy buyers repelled by the defendant's price increase"); see also Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1441 (9th Cir. 1995) (explaining that "[m]arket power cannot be inferred solely from the existence of entry barriers and a dominant market share" because if existing rivals "can quickly respond to any predator's attempt to raise prices above competitive levels, the predator will suffer an immediate loss of market share to competitors" and therefore "does not have market power").

That is all the more true in this market, where Amex competes against two historically dominant rivals that devote tremendous resources to competing for

77

cardholder purchase volume.  See Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d

50, 58 (2d Cir. 1997) (explaining that "established buyer preferences . . . will not

ordinarily be a serious entry barrier," particularly where "established large

competitors can afford to invest their resources" to compete in the market

(quotation marks and citations omitted)).  In fact, as explained above, Visa and

MasterCard's structural advantages in the marketplace (see supra at 15-17) have

given them a systematic leg up in their competition with Amex for cardholders.

Third, in arriving at the conclusion that Amex's cardholder insistence

can be a source of durable market power, the District Court misapplied a brief

observation in Visa II—contained in a single sentence—that customers' preference

for Visa and MasterCard contributed to the dominant networks' market power.

See 344 F.3d at 240 (citing merchants' testimony "that they could not refuse to

accept payment by Visa or MasterCard, even if faced with significant price

increases, because of customer preference").

This attempt to graft this statement on to the issues in this case by

comparing Amex to Visa and MasterCard is another "red herring" that fails to

account for the vast structural advantages enjoyed by the dominant networks.  Visa

and MasterCard's market power derives from their entrenched, durable ubiquity.

In Visa II, this Court found that Visa and MasterCard's entrenched market

positions and the challenged restraints reduced their incentive to invest in premium

78

services, see, e.g., 344 F.3d at 240-41; by contrast, there is no dispute that Amex cardholders' insistence depends entirely on Amex continuing to make such investments. The District Court's own factual findings regarding insistence show that Amex lacks market power, not that it possesses it.

Fourth, it makes no sense to conclude that insistence "amplifie[s]" Amex's modest share of the relevant market where that insistence is based on a fraction of Amex's total transaction volume. SPA71. Even if one were to assume that 50 percent of Amex cardholders are so "insistent" that they would walk away from a merchant that declined to accept Amex—and there is no evidence suggesting that the number is anywhere near that high—that would mean that the District Court concluded that a company with a share of 13 percent (half of 26 percent) could have market power as long as its customers were very loyal. That is a remarkable expansion of the law.[20]

---

20



**V.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN DISREGARDING AMEX'S RIGHTS UNDER <u>UNITED STATES V. COLGATE & CO</u>.**

In <u>United States v. Colgate & Co.</u>, 250 U.S. 300 (1919), and more recently in <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752 (1984), the Supreme Court held that a firm "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently". <u>Id.</u> at 761. Firms have that right even if they have market power and even if they would be prohibited under Section 1 from entering into binding agreements that prevent the conduct they may seek to deter through unilateral refusals to deal. Indeed, that is the very essence of the <u>Colgate</u> decision. Eight years before <u>Colgate</u>, the Supreme Court had held resale price maintenance contracts <u>per se</u> unlawful.[21] Yet the Court held in <u>Colgate</u> that it was <u>nonetheless legal</u> for a manufacturer to accomplish the same result without a contract, by announcing its desired resale price and then adopting a unilateral policy of refusing to deal with distributors that refused to comply. 250 U.S. at 307-08 (distinguishing <u>Dr. Miles</u> as a case in which "the unlawful combination was effected through contracts").

Here, the District Court disregarded <u>Colgate</u> in two ways—one that compromises its liability decision and another that vitiates the resulting injunction.

---

[21] See <u>Dr. Miles Medical Co. v. John D. Park & Sons Co.</u>, 220 U.S. 373, 406-09 (1911), <u>overruled by</u> <u>Leegin</u>, 551 U.S. at 887-89.

As to liability, the District Court adopted the conclusion of the Government's economics expert, Professor Katz, that competition would be better off without the NDPs. See generally SPA116-27. Professor Katz based that conclusion on a comparison between the existing state of competition with the NDPs in place and a hypothetical "but for" world in which the NDPs did not exist. However, in constructing that hypothetical but-for world, Professor Katz made a critical and erroneous assumption—that Amex would be powerless to resist merchant steering by unilaterally terminating merchants who engage in the practice. Tr.4193:20-4194:13. That assumption is contrary to the Supreme Court's clear precedents that, even without the NDPs, Amex has the right not to do business with merchants who undermine its brand. Even in a but-for world without the NDPs, Amex could—and undoubtedly would—have undertaken unilateral action to help curb the harmful effects of steering. And its unilateral actions undoubtedly would have had some effect in curbing steering by merchants.

Before it could find that the NDPs' limitations on steering had an anticompetitive effect, the District Court was required, given Colgate, to determine how competition in fact would have been different in the but-for world absent the NDPs but with Amex taking unilateral action to curb steering. However, even after Amex pointed out this flaw in the Government's analysis, neither Professor Katz nor the District Court made any attempt to assess the marginal effect of the

NDPs as compared to a world in which Amex had to resort to unilateral termination under Colgate to protect its brand. Tr.4193:20-4194:13. There is no analysis in the District Court's opinion, and no testimony in the record, concerning this comparison. In effect, the Government and the District Court compared the status quo to a hypothetical world in which Amex had already been found to have violated Section 1 by virtue of having NDPs and, as a result, had been enjoined from engaging in otherwise lawful conduct—in other words, a but-for world in which the Government had already won its lawsuit.

And by imposing a permanent injunction on Amex, the District Court entered precisely the kind of injunction that had been anticipated by Professor Katz's competitive effects analysis. Since the District Court's injunction went into effect on July 20 of this year, Amex has been required to do business with merchants who discriminate against Amex by steering its customers away from Amex and toward other credit cards. As a result, Amex has been stripped of its right to stop doing business with merchants, even if they undermine Amex's brand and the investments that Amex makes in its relationship with its cardholders. Indeed, the injunction requires that Amex renew a contract with a merchant that engages in these activities even where that contract would have expired on its own terms. SPA164 (defining "termination" to include allowing a merchant's contract to expire).

Not only is the injunction predicated on the Court's erroneous liability decision, but it constitutes independent legal error because it is based on a fundamental misreading of Colgate. The District Court held that "Colgate cannot stand for the proposition that a firm's ordinary right to refuse to deal is sacrosanct under circumstances where that firm could use its market power to impose the exact same harm on competition". SPA186. As discussed above, however, that is precisely what Colgate stands for, and that is the difference between Dr. Miles, where prices were unlawfully set by agreement, and Colgate, where prices were unilaterally set by announcing a policy and refusing to deal. As this Circuit has confirmed, "[u]nilateral conduct on the part of a single person or enterprise falls outside the purview of [Section 1 of the Sherman Act]". Capital Imaging, 996 F.2d at 542. While discounting Amex's rights under Colgate, the Court instead justified its injunction based on merchants' "right to engage in steering". SPA177. But merchants have no such "right": Amex has no obligation to deal with merchants in the first place. In requiring that Amex do business with merchants who actively dissuade their customers from using their Amex cards, the District Court's injunction unjustifiably trampled on Amex's right to engage in unilateral conduct that cannot be subject to legal sanction under the antitrust laws.

83

## CONCLUSION

For the foregoing reasons, the judgment of the District Court and the

Permanent Injunction should be reversed.

Dated:  August 3, 2015

CRAVATH, SWAINE & MOORE LLP,

by

/s/ Evan R. Chesler
Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

BOIES, SCHILLER & FLEXNER LLP,

by

/s/ Donald L. Flexner
Donald L. Flexner
Philip C. Korologos
Eric J. Brenner

575 Lexington Avenue
Seventh Floor
New York, NY 10022
(212) 446-2300

*Attorneys for Defendants-Appellants
American Express Company and American
Express Travel Related Services Company,
Inc.*

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, I certify under penalty of perjury that the foregoing Brief of

Defendants-Appellants American Express Company and American Express Travel

Related Services Company, Inc. (Page Proof) is prepared in a proportionally

spaced typeface (14-point Times New Roman) and contains 19,492 words, as

calculated by the Microsoft Word 2007 word processing program and excluding

parts of the Brief exempted by Rule 32(a)(7)(B)(iii).  Accordingly, it complies with

Rule 32(a)(5)(A) and with the Court's Order, dated June 26, 2015, granting

Defendant-Appellants leave to file an oversized principal brief of up to 20,000

words.

August 3, 2015


/s/ Evan R. Chesler
Evan R. Chesler